JOHN J. PASCALE, SR., PLAINTIFF-APPELLANT, v. DAVID P. PASCALE, ET AL., DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 22, 1987—Decided March 18, 1987.

134

Before Judges DREIER, SHEBELL and STERN.

*Edward N. Fitzpatrick* argued the cause for appellant (*Clapp & Eisenberg,* attorneys; *John A. Avery,* on the brief).

*James A. Scarpone* argued the cause for respondents, David P. Pascale and Quality Tool & Die Co., Inc. (*Scarpone and*

*Edelson,* attorneys; *James A. Scarpone* and *Mark A. Fury,* on the brief).

*Steven D. Fleissig* argued the cause for respondent, JBS (*Kalb, Friedman and Siegelbaum,* attorneys; *Steven D. Fleissig,* on the brief).

*Walter E. Monaghan* argued the cause for respondent, BSB (*Haggerty & Donohue,* attorneys; *Walter E. Monaghan,* on the brief).

The opinion of the court was delivered by

SHEBELL, J.A.D.

Plaintiff, John J. Pascale, Sr., appeals the Chancery Division's refusal after trial to set aside certain transfers he had made to his son, David P. Pascale. The then seventy year old plaintiff asserts that this son stood in a confidential relationship whereby plaintiff relied upon him to handle his finances and to arrange for the handling of his legal affairs. Plaintiff contends that because of his attorney BSB's conflict of interest and that attorney's relationship with David, plaintiff was denied independent advice of counsel and as a consequence made an immediate gift of his business and property without retaining control or a right of revocation.

The basic factual findings of the trial judge are supported by the record and may not be disturbed. *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484 (1974). Those facts as are relevant to the issue before us reflect that appellant founded a tool and die business around 1939 which was later incorporated under the name Quality Tool & Die Company, Inc. ("Quality"). He also founded a second company, Majoda Tool & Die Company, Inc. He brought his son, the defendant David, into the business on a full time basis around 1971. His older son, John, Jr., had been in the business for several years prior to David's association.

In 1972 appellant's wife instituted a divorce action against him and the two sons chose sides, John, Jr. siding with the

mother, and David with the father. As a result, plaintiff did not see John, Jr. again until 1978 when their differences apparently were ended by John, Jr. asking his father's forgiveness. Prompted by the divorce action, plaintiff signed a stock certificate purporting to transfer ownership of his shares in Quality to David with the endorsement being backdated to October 16, 1968. It is claimed that the stock certificate and the corporate books have been lost, although David produced at trial a photocopy of the stock certificate signed by his father.

There has been no determination of either the effect of the signing of the certificate by the father or whether there was actual delivery of the certificate; however, a report filed in the matrimonial action pursuant to court order asserts that the stock of Quality and Majoda were transferred from plaintiff to David on October 16, 1968. There was no change of responsibilities or control following the purported transfer. Up to 1979 the father seemed to be in control with David handling office work and managing accounts.

David and his wife received many gifts from plaintiff over the years including valuable real estate, cash, jewelry, fur coats, automobiles and the like. For several years the father registered assets jointly in his name and David's as joint tenants. David handled his father's personal affairs including check writing, personal bills, safe deposit boxes, securities and the like. Late in 1975 the Internal Revenue Service made a tax deficiency claim against the father and his companies which caused him to retain an attorney. That case was settled in January 1979; however, in the interim plaintiff requested that this attorney undertake estate planning on his behalf. As plaintiff did not want to be bothered with the details of either the IRS claim or his estate planning he directed his attorney to communicate with David and his accountant, JBS.

As early as 1977 a recapitalization plan was suggested by the father's attorney. This plan, as later developed, proposed the transfer of land owned by the father in Hoboken to Quality and

the converting of common stock into three classes: preferred as well as voting and non-voting common. The common stock was to be classified in such a way that plaintiff would retain the voting stock with the non-voting stock going to David. Unquestionably plaintiff desired to leave his business assets to David and to avoid estate and inheritance taxes. The recapitalization proposals, however, were premised upon plaintiff's ownership of the Quality stock.

On May 9, 1979 a meeting was held between the father's attorney, an associate of his attorney, his accountant and David Pascale. The agenda was as follows:

Discuss possible future divesture by John to David, in particular the Quality Tool buildings on Grand and Adams Streets; Possible future transfer of Quality Tool stock and also consideration of David's estate planning. For the time being, they want to abandon future subdivision of the real estate.

At the May 9, 1979 meeting the father's attorney allegedly first became aware of the 1972 transfer of the Quality stock to David as reflected in the report introduced in the matrimonial litigation and was "shocked." It was evident there was confusion and conflict as to who owned the stock, with John, Sr. believing he owned it and David apparently thinking he did. A meeting was called for May 24, 1979 at which plaintiff was to personally appear. Without speaking to plaintiff the attorneys prepared documents to transfer Quality stock and property to David as an immediate outright gift. Plaintiff did not receive the documents in advance of the meeting with his attorney and David at which he executed documents transferring Quality stock and real estate to David. Plaintiff claims he did not read these documents before signing them because he trusted David. Although his attorney testified he explained each of the documents, he does not remember discussing the implications of the transfers with the father. David, however, testified that the attorney did explain this to his father. It was the attorney's position that the implications of making the gift were so obvious that there was nothing to discuss. On that same day David executed a will, prepared by the same attorney. The will

made the father the beneficiary of the income from a stock trust composed of the Quality stock; however, on October 7, 1980 David executed another will eliminating that provision.

After the May 24, 1979 transfers the father continued in the business as before, earning $3,500 per week plus approximately $700 travel and entertainment expenses. David attempted to reduce his father's salary to $3,000 a week in 1980; but the father raised his salary back to $3,500 retroactively. In October 1981 the father had a disagreement with David over the father's helping his older son, John, Jr., who was running his own machine shop. Plaintiff asserts it was then he first became aware he no longer had control of Quality as David told him to leave the premises and to see a lawyer if he did not think David had the power to bar him from the premises. The father was not dropped from the payroll until October 1982 after the institution of this litigation.

In the Spring of 1982 plaintiff contacted his attorney to find out what had happened. He received a letter from his attorney's associate, giving the following background on the transfers:

> In connection with the transfer of these shares to David it became apparent that you could not locate the original certificate. After some consideration and conversation with you, we prepared for you an affidavit indicating that you were the owner of 310 shares, had lost the certificate, had not pledged the certificate, etc.

Although it does not appear that such discussions took place, the documentation and transfers appear to have been prepared in accordance with such a proposition.

Defendants point out that no claim of incompetence, disability or diminished capacity has been asserted on behalf of the father, a strong willed, powerful personality. The trial judge found that:

> On May 24, 1979 [John] Pascale was an obdurate, domineering, blunt, outspoken, vindictive, crafty and intelligent 76 year old man who was in full possession of his mental and physical faculties. He possessed these characteristics at all relevant times prior to that date. Pascale was not the type of person who could be persuaded to do anything he did not want to do.

Defendants also note that the trial judge found that appellant "knew and understood the import, effect and consequences of his signing these documents ..." and that "[h]is conduct on this date was consistent with his previously expressed intention to give 'everything' to David and with his having lavished expensive gifts on David and David's wife over a substantial period of time."

We first examine whether under the theory of "undue influence" it is necessary for appellant to prove David was the dominant one in the relationship. The facts do not appear capable of sustaining such a finding and the trial judge found to the contrary. The rule of law concerning undue influence was often stated in such a way as to be inextricably entwined with the premise that, not the mere relationship of parent-child alone, but rather a confidential relationship between the two with a conveyance from the weaker to the dominant raised a presumption as to undue influence. *Soper v. Cisco*, 85 *N.J.Eq.* 165, 169–170 (E. & A.1915).

However, the rule has a much broader scope and "[i]ts purpose is not so much to afford protection to the donor against the consequences of undue influence exercised over him by the donee as it is to afford him protection against the consequences of voluntary action on his part, induced by the existence of the relationship between them, the effect of which, upon his own interests, he may only partially understand or appreciate." *Slack v. Rees*, 66 *N.J.Eq.* 447, 449 (E. & A.1904). Thus, the rule is stated in *Hall v. Otterson*, 52 *N.J.Eq.* 522, 528 (Ch.1894) without reference to the requirement of dominance, as follows:

In all transactions between persons occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, is presumed, or in fact reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed and who has acquired an advantage, to show affirmatively, not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was *well understood.* [ (emphasis in original) (citing in part *Mott v. Mott*, 49 *N.J.Eq.* 192, 198 (Ch.1891)) ].

If a finding of dominant relationship were required, it appears such a relationship might be presumed and satisfied solely on a finding of "trust justifiably reposed," when the parties occupy "relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired or, in fact, reasonably exists." *In re Fulper's Estate*, 99 *N.J.Eq.* 293, 314 (Prerog.Ct.1926).

■■ We further reflect upon the facts that the rule was developed in earlier days and that the cases invariably spoke of situations of dominance by reason of age or infirmity of the parent and the consequence of making improvident gifts leaving the parent impoverished. *See Post v. Hagan*, 71 *N.J.Eq.* 234 (E. & A.1907). This rule is from an era when matters were simpler and the need for expert advice to understand the consequences of one's acts was less necessary than in today's world. We are convinced that in the present day it is equitable and just to require only that it be proven that the donor has reposed such trust in the handling of financial and legal affairs in the donee that a confidential relationship exists. Once this has been established the donee must carry the burden of affirmatively demonstrating that there was no deception or undue influence and that all was open, fair and completely understood. *Petruccio v. Petruccio*, 205 *N.J.Super.* 577, 581 (App.Div.1985).

■ The trial judge did not place upon David the burden of showing that his father fully understood the consequences of his act and had obtained independent and competent advice with respect to the consequences of the transfers. Plaintiff placed in David the utmost trust in the handling of his personal, financial and legal affairs and must carry that burden. Proof of undue influence, dominance, weakness, dependence or the like is unnecessary where the trust and confidential relationship is so clearly established. *Ibid.; In re Dodge*, 50 *N.J.* 192, 227–229 (1967). The earlier requirement that the gift lead to impoverishment appears to be without justification where, as

here, the monetary value of the loss is great compared to the relative value of the gifts in the older cases which established the rule. In this case some significant change in appellant's life-style would most likely be felt by the loss of over $4,000 per week income.

As stated in *Dodge*, "In the application of this rule it is not necessary that the donee occupy such a dominant position toward the donor as to create an inference that the donor was unable to assert his will in opposition to that of the donee." 50 *N.J.* at 227. David had the burden of showing by clear and convincing evidence that his father intended to make a gift and unmistakenly intended to relinquish permanently the ownership of the companies and property. *Id.* at 228; *Dessel v. Dessel*, 122 *N.J.Super.* 119, 123 (App.Div.1972), aff'd 62 *N.J.* 141 (1973).

That aspect of the rule originally laid down in *Mott v. Mott*, 49 *N.J.Eq.* 192, 198 (Ch.1891) requiring that the transaction be "well understood" could not on the facts presented here, in our opinion, be satisfied without independent advice of legal counsel free from all conflict of interest. The presence of a conflict of interest satisfies the second prong of the two-part test laid down in *Haynes v. First Nat'l State Bank of New Jersey*, 87 *N.J.* 163 (1981), wherein it was stated that the two elements necessary to create a presumption of undue influence are first, a "confidential relationship" and second, the presence of suspicious circumstances, which need be no more than "slight." 87 *N.J.* at 176. As further noted in *Haynes:*

> It has often been recognized that a conflict on the part of an attorney in a testimonial situation is fraught with a high potential for undue influence, generating a strong presumption that there was such improper influence and warranting a greater quantum of proof to dispel the presumption. [*Id.* at 178].

While here the attorney was not a beneficiary, it is fundamental that the father in these circumstances was entitled to independent advice from an attorney free from any conflict.

██ Although the father openly expressed his intent to leave David his business assets, he wanted to be assured he would keep control of the company as he would have under the plans

that were in progress up until the May 24th transfers. Indeed, it was his allegation that he was assured even on that day that he would keep control by retaining the voting stock. In any event, even absent fraud he should have been advised at least to explore the possibility of accomplishing his objectives without giving up control. It may well be that even absent a conflict the legal counselling he received was so lacking as to deny him a full understanding of the transfer. Full understanding of the transaction required knowledge of the existence of alternate means which might fulfill the father's objectives without causing him to give up all protection.

Of paramount importance on the issue of whether there was a conflict is the question that arose concerning the ownership of the Quality stock, an issue not yet resolved. Considering the "loss" of the corporate books and the stock certificate, the question of whether delivery of the stock was accomplished or even intended was not clear. While the record evidenced an attempt to deceive the matrimonial court and to deny appellant's wife her interest in the assets, counsel should have recognized that the question of whether the father intended actual transfer in 1972 when the stock was backdated was in doubt; the father still considered himself to be the owner. This ownership dispute and the trust relationship between the father and David raised an immediate conflict having the clear potential to raise in the mind of legal counsel the question as to which of the two masters was to be served and protected. *See In re Chase*, 68 *N.J.* 392, 396 (1975); DR 5–105. *Cf.* RPC 1.7(a). The question of loyalty was compounded by the drafting of the will for David which was signed the same day as the transfers but provided no lasting protection to the father.

*Haynes* established that the presumption of undue influence created by a provisional conflict of interest on the part of an attorney, coupled with confidential relationships between the donee and the beneficiary as well as the attorney, must be rebutted by clear and convincing evidence. 87 *N.J.* at 182–183. Regardless of the extent of the burden, the attorney was

required to provide complete advice to his client, the father. It was his responsibility to explain the issues involved in the question of stock ownership, and to render advice concerning less precarious means of fulfilling the father's desire to make the son his beneficiary as well as to disclose the potential for conflict because of the relationship that had developed between David and his attorney. The attorney was not sensitive to his obligation to fully advise the father and to avoid the potential conflict.

We are satisfied that the transfers of May 24, 1979 which are the only matters pursued on this appeal, are tainted and must be set aside. We remand this matter to the trial court for a determination of the ownership of the companies according to the rights of the parties prior to the May 24, 1979 transfer. In this regard the interests of justice may require that any pending claims of the wife be joined in this action. Any claims of David concerning contributions by him to the corporations or improvements to the property should be considered and weighed against the advantage or compensation he received while in control of the corporations and property. Appellant in seeking equity must do equity and receive back no more than he has parted with and subsequently lost by the transfers.

We reverse and remand.