JOHN J. PASCALE, SR., PLAINTIFF–RESPONDENT, v. DAVID P. PASCALE AND QUALITY TOOL & DIE CO., INC., DEFEND-ANTS–APPELLANTS, AND BENNETT J. SCHWARTZ AND BERNARD S. BERKOWITZ, DEFENDANTS.

Argued November 30, 1987—Decided October 17, 1988.

*James A. Scarpone* argued the cause for appellants (*Scarpone & Edelson,* attorneys).

*Edward N. Fitzpatrick* argued the cause for respondent (*Clapp & Eisenberg,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

Plaintiff, John J. Pascale (Pascale), seeks to set aside a transfer of stock and real estate to his son David P. Pascale (David). Pascale contends that a confidential relationship existed between him and David and that the same attorney advised both of them in connection with the transfer. The issue is

whether the transfers are invalid because David exercised undue influence over Pascale.

In an unreported opinion, the trial court dismissed Pascale's complaint, finding that he fully understood the transfers and that they were untainted by either a confidential relationship or a conflict of interest. The Appellate Division reversed because it believed the transfers were the product of undue influence. 216 *N.J.Super.* 133 (1987). We granted certification, 108 *N.J.* 183 (1987), and now reverse the judgment of the Appellate Division.

I

Nearly fifty years ago, in 1939, Pascale founded a machine tool and die business, which was later incorporated under the name Quality Tool & Die Company Inc. (Quality). In 1952, plaintiff established a second, smaller machine tool company, Majoda Tool and Die Company (Majoda), which operated out of Quality's premises in Hoboken. By 1960, both businesses had become quite profitable.

In the 1960s, Pascale introduced his older son, John, Jr., into the businesses, and six years later, Pascale gave all the stock in Majoda to John, Jr. David began full-time employment with Quality in 1971. Sometime before 1972, John, Jr. left Majoda and assigned all of his stock to Pascale and David.

In March 1972, Pascale's wife instituted a divorce action, and the two sons chose sides: John, Jr. sided with his mother, and David with Pascale. Consequently, Pascale did not see John, Jr. again until their apparent reconciliation in 1978. In 1973, to minimize his net worth and thereby to reduce his wife's share in an equitable distribution of his assets, Pascale signed a stock certificate, which purported to transfer ownership of his Quality shares to David. The certificate, however, was backdated to 1968, four years before the institution of the divorce action.

Initially, the fraud worked. An accounting firm, which was appointed by the matrimonial court to investigate Pascale's

assets, reported on June 7, 1973, that Pascale was "essentially responsible" for the operations of Quality and Majoda, but that he had transferred his stock in both corporations to David on October 16, 1968. The matrimonial court approved the property settlement based on this false information. Although Pascale claims that the stock certificate and corporate books are lost, David produced at the trial of the within matter a photocopy of a signed copy of the backdated October 16, 1968, stock certificate.

Consistent with the certificate, David claimed in his deposition that Pascale transferred all the Quality stock to him in 1968. David denied that any transfer of stock from his father to him occurred between 1970 and 1976. When asked at trial who owned the Quality stock in 1976, however, David testified, "my father did." The foregoing facts led the trial court to find that Pascale signed the backdated certificate in 1973 as part of "a scheme to defraud [Pascale's] wife and the matrimonial court."

Following the transfer, Pascale and David continued in their respective roles at Quality. Until 1979, Pascale remained in control, with David managing accounts and performing other office work. From 1971 until late 1981, Pascale and David enjoyed a close personal relationship. Pascale lavished expensive gifts on David and his wife, including cars, real estate, a sable coat, jewelry, and large amounts of cash. David handled Pascale's personal financial affairs, such as check writing, personal bills, safe deposit boxes, and securities.

Late in 1975, however, the Internal Revenue Service asserted a tax deficiency claim against Pascale personally and also against Quality. On the advice of his personal and business accountant, J. Bennett Schwartz, Pascale retained a tax attorney, Bernard Berkowitz, who resolved the IRS matter in January 1979. In the interim, Pascale asked Berkowitz to prepare an estate plan for him.

Early in his representation on both matters, Berkowitz communicated exclusively with Pascale. Pascale, however, directed Berkowitz to "deal directly with David Pascale or Ben Schwartz, but primarily David." According to Berkowitz, Pascale instructed him to develop an estate plan that left "everything to David" while incurring as little tax liability as possible. David confirmed Berkowitz's testimony by acknowledging that he served as an agent for Pascale in dealing with Berkowitz.

As early as 1977, Berkowitz and his associate, Stephen C. Levitt, discussed with David and Schwartz an estate plan that would have left Pascale in control of Quality. For tax purposes, Berkowitz recommended that Pascale transfer to Quality land he owned in Hoboken and that Pascale convert his common stock in Quality into three classes: preferred stock, voting common stock, and nonvoting common stock. The then-existing value of Quality would be ascribed to the preferred stock, which Pascale would retain along with all the voting common stock. David would receive the nonvoting common stock to which all future growth would be attributed.

In May 1978, Berkowitz worked out the details of the recapitalization with David and Schwartz, who in turn informed Pascale of the plan. Although Pascale approved the recapitalization, the plan was never executed.

A year later, on May 9, 1979, Berkowitz, Levitt, and Schwartz met with David. At this meeting, while reading the 1973 accountant's report from the matrimonial action, Berkowitz first learned that Pascale apparently had transferred the Quality shares to David in 1968. It became apparent to Berkowitz that there was a conflict between David and Pascale about the ownership of the Quality stock. As Berkowitz testified, "David Pascale thought he owned the stock; John Pascale thought that he owned the stock." Because the recapitalization plan was premised on Pascale's ownership of the Quality stock, the confusion about stock ownership caused Berkowitz to abandon this plan.

Berkowitz also ascertained that no gift tax had been paid on the backdated transaction. Confronted with this information, Berkowitz devised an alternate plan to fulfill Pascale's intention of leaving, with a minimal tax impact, all of his business assets to David. The plan was for Pascale to give the Hoboken properties and the Quality stock to David, with David paying the gift taxes of $54,947. That proposal was consistent with the will prepared by a different attorney and executed by Pascale on December 10, 1975, in which Pascale left his entire estate to David. Berkowitz further believed that the gift to David would reduce the problems inherent in the fraudulent matrimonial scheme, which was evidenced by the backdated stock certificate.

The trial court found that Berkowitz discussed the alternate plan with David and Schwartz, and that each of them in turn discussed it with Pascale. Both David and Schwartz claimed that Pascale understood that by agreeing with this plan, he would be yielding control of Quality to David. Indeed, Schwartz testified that he spoke with Pascale on May 24, 1979, the day Pascale executed the alternate plan, and specifically admonished him that by executing the plan, "he was giving the company away, he could be thrown out in a week."

On that date, Berkowitz, David, and Pascale met at Pascale's office in Hoboken to execute the plan. According to Levitt, with the exception of several letters that his law firm had mailed to Pascale, this meeting was the first time since January 11, 1978, that the firm "had any contact or has any records that reflect any contact with John Pascale." At the meeting, Pascale signed various documents, including two stock certificates of Quality: one that described Pascale as the owner of 310 shares, and the other that described David as the owner of 310 shares. Pascale also signed an assignment transferring his 310 shares of Quality to David, a deed from Pascale and Quality conveying the Quality premises in Hoboken to David, and an affidavit of consideration.

The main dispute in this case is whether Pascale understood that these documents effected an outright transfer of the Quality stock and real estate to David. On this point, as on others, the testimony at trial was in sharp conflict.

According to Pascale, before the May 24, 1979, meeting, he had not received any of the documents. He contends that he had no opportunity to read the documents before signing them, that neither Berkowitz nor David explained the documents to him, and that he relied on them in signing the documents. Pascale testified that he thought he "was to have control [of Quality] to the day I died or was incapable of handling the business."

David and Berkowitz testified, however, that Berkowitz reviewed the documents in detail with Pascale before he signed them. Berkowitz did not remember whether he discussed with Pascale the implications of transferring the Quality stock and the Hoboken properties to David, but he believed that the implications were so obvious that such a discussion was unnecessary. David, however, testified that Berkowitz explained to Pascale that the effect of signing the documents would be to relinquish control of Quality to David. Pascale signed the documents.

On the same day, David executed a will prepared by Berkowitz, in which David bequeathed all his Quality stock to a testamentary stock trust, of which Pascale was the trustee. The beneficiaries of the trust were Pascale and David's wife, and all income was payable to Pascale during his lifetime. In the following year, on October 7, 1980, however, David executed another will, which eliminated the trust and provided that the Quality stock and land would pass to his wife, if she survived, and if she predeceased him, to his mother-in-law.

After the May 24, 1979, meeting, David assumed greater responsibility in managing Quality. Pascale remained active in the business, and continued to receive his $3,500 weekly salary, plus approximately $700 in travel and entertainment expenses.

In January 1980, however, David attempted to reduce Pascale's salary to $3,000 per week, but Pascale responded by retroactively reinstating his salary to $3,500.

Relations between David and Pascale cooled when David learned that Pascale was helping John, Jr. in a competing machine and tool business. According to Pascale, he first learned that he was no longer in control of Quality in October 1981 following a dispute with David over Pascale's assistance to John, Jr. David ordered Pascale to leave the Quality premises and to consult with a lawyer to confirm that David now controlled Quality and had the right to terminate Pascale's employment. Notwithstanding their dispute, Pascale remained on Quality's payroll until October 1982, two months after he filed the within action. In the interim, during the spring of 1982, Pascale consulted with Levitt, who told him that the effect of the May 24, 1979, transfers was to place David in control of Quality.

Confronted with this conflicting testimony, the trial court rejected Pascale's theory of undue influence and held that Pascale was not entitled to rescind the May 24, 1979, transfers. The trial court found that

> [o]n May 24, 1979 Pascale was an obdurate, domineering, blunt, outspoken, vindictive, crafty and intelligent 76 [sic: 70] year old man who was in full possession of his mental and physical faculties. He possessed these characteristics at all relevant times prior to that date. Pascale was not the type of person who could be persuaded to do anything he did not want to do.

The trial court also found that

> Pascale has produced no credible proof to establish any mental indisposition, psychological dependence, or lack of knowledge, comprehension or understanding on his part with respect to the gift transfers to David. He has not established the existence of a confidential relationship or such circumstances sufficient to create a presumption of undue influence and thereby shift the burden of proof to defendants. Even if Pascale were deemed to have succeeded in achieving this result (which I expressly find has not occurred), I would conclude that defendants have demonstrated by clear, convincing and competent proof that Pascale's execution of the documents in issue was completed without deception or undue influence and that all of the circumstances of the execution were fair, open and voluntary and that Pascale understood the consequences of his actions.

Finally, the trial court found that Pascale's attorney, Berkowitz, was not in a position of conflict when he prepared Pascale's estate plan and advised him to execute it, stating, "[a]t all times Berkowitz was Pascale's rather than David's attorney."

The Appellate Division reversed. 216 *N.J.Super.* 133. It found that a confidential relationship existed between Pascale and David, and that Berkowitz was in a position of conflict when he advised Pascale to execute the transfers. It therefore found that the trial court had failed to place on David "the burden of showing by clear and convincing evidence that his father intended to make a gift and unmistakenly intended to relinquish permanently the ownership of the companies and property." *Id.* at 141. Moreover, the Appellate Division held that the rule "requiring that the transaction be 'well understood' could not on the facts presented here, in our opinion, be satisfied without independent advice of legal counsel free from all conflict of interest." *Ibid.*

## II

■ In general, a valid gift has three elements. First, the donor must perform some act constituting the actual or symbolic delivery of the subject matter of the gift. Second, the donor must possess the intent to give. Third, the donee must accept the gift. R. Brown, *Personal Property* § 7.1, at 77–78 (2d ed. 1975). Our cases also recognize an additional element, the relinquishment by the donor "of ownership and dominion over the subject matter of the gift." *In re Dodge,* 50 *N.J.* 192, 216 (1967). This case focuses on whether the donor intended to make a gift of real estate and shares of stock to the donee.

■■ An adult donor is generally presumed to be competent to make a gift. *See Roth v. Roth,* 571 *S.W.*2d 659, 5 *A.L.R.*4th 350, 363 (Mo.Ct.App.1979) (when a parent transfers stock to a child, the law presumes that the parent intended to make the gift); *see also Conners v. Murphy,* 100 *N.J.Eq.* 280, 282 (E. & A. 1926) ("[t]he test of mental capacity to make a gift is that

the donor shall have the ability to understand the nature and effect of the transaction"); *cf. Haynes v. First Nat'l State Bank*, 87 *N.J.* 163, 175–76 (1981) (presumption of competence at time of execution of will). Here, the donor claims, however, that the gift was the product not of his free will but of the undue influence of the donee. "Undue influence" has been defined as that sort of influence that prevents the person over whom it is exerted "from following the dictates of his own mind and will and accepting instead the domination and influence of another." *Haynes, supra*, 87 *N.J.* at 176 (quoting *In re Neuman*, 133 *N.J.Eq.* 532, 534 (E. & A. 1943)); *accord Loveridge v. Brown*, 98 *N.J.Eq.* 381, 389 (E. & A. 1925); *see also In re Hale's Will*, 21 *N.J.* 284, 288 (1956) (to constitute undue influence, there must be a disruption of "the freedom of will and judgment of the testator."). In respect of an *inter vivos* gift, a presumption of undue influence arises when the contestant proves that the donee dominated the will of the donor, *Seylaz v. Bennett*, 5 *N.J.* 168, 172 (1950); *Haydock v. Haydock*, 34 *N.J.Eq.* 570, 574 (E. & A. 1881), or when a confidential relationship exists between donor and donee, *In re Dodge, supra*, 50 *N.J.* at 227; *Mott v. Mott*, 49 *N.J.Eq.* 192, 198 (Ch.1891).

In explaining the reason for the presumption of undue influence when the donee enjoys a confidential relationship with the donor, we have stated that

"[i]ts purpose is not so much to afford protection to the donor against the consequences of undue influence exercised over him by the donee, as it is to afford him protection against the consequences of voluntary action on his part, induced by the existence of the relationship between them, the effect of which upon his own interests he may only partially understand or appreciate." [*In re Dodge, supra*, 50 *N.J.* at 228 (quoting *Slack v. Rees*, 66 *N.J.Eq.* 447, 449 (E. & A. 1904)).]

With respect to a will, to create a presumption of undue influence the contestant, by comparison, must show the existence not only of a confidential relationship, but also "suspicious circumstances," however "slight." *Haynes, supra*, 87 *N.J.* at 176. Without proof of suspicious circumstances, a confidential relationship will not give rise to the presumption in the testa-

mentary context. 5 *N.J.Practice, Clapp, Wills & Administration* § 62, at 224–28 (3d ed. 1982). Underlying the absence of a requirement of showing suspicious circumstances with an *inter vivos* gift is the belief that a living donor is not likely to give to another something that he or she can still enjoy. *Id.* at § 62, at 226 n. 15.

When the presumption of undue influence arises from an *inter vivos* gift, the donee has the burden of showing by clear and convincing evidence not only that "no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood." *In re Dodge, supra,* 50 *N.J.* at 227 (quoting *In re Fulper's Estate,* 99 *N.J.Eq.* 292, 302 (Prerog.Ct.1926)); *accord Slack, supra,* 66 *N.J.Eq.* at 449; *Mott, supra,* 49 *N.J.Eq.* at 198. If the donor is dependent on and makes an "improvident gift" to the donee that strips the donor of all or virtually all his assets, a presumption arises that the donor did not understand the consequences of his act. *Vanderbach v. Vollinger,* 1 *N.J.* 481, 489 (1949). In this context, the donee must show that the donor "had the benefit of competent and disinterested counsel." *Seylaz, supra,* 5 *N.J.* at 173; *accord Vanderbach, supra,* 1 *N.J.* at 489. A similar rule applies when a physically or mentally weakened donor, without receiving any advice, makes a gift to a donee on whom the donor depends. If that gift leaves the donor without adequate means of support, the presumption of undue influence is conclusive. *Seylaz, supra,* 5 *N.J.* at 173; *Vanderbach, supra,* 1 *N.J.* at 488–89; *In re Fulper's Estate, supra,* 99 *N.J.Eq.* at 302. When the donor is not dependent on the donee, however, "independent advice is not a prerequisite to the validity of an improvident gift even though the relationship between the parties is one of trust and confidence." *Seylaz, supra,* 5 *N.J.* at 173.

Here, the evidence establishes that Pascale was not generally dependent on or servient to David. In fact, the trial court, which carefully evaluated the competence and credibility of the

parties, found that "at all relevant times Pascale, rather than David, was the dominant person." Although the gift did not impoverish Pascale, we nonetheless agree with the Appellate Division that it was sufficiently substantial to be considered as improvident, if Pascale were not competent and did not understand the nature of the transaction. 216 *N.J.Super.* at 140–41. Hence, we are remitted to evaluating the validity of a substantial gift from an elderly, albeit fully competent, father to a son with whom he enjoyed a confidential relationship.

We have previously summarized the relevant principles when such a relationship exists:

> [W]henever it appears that the relations between the parties to an *inter vivos* gift are of such character that in reasonable probability they do not deal with each other on terms of equality because one has given friendship and justifiably reposes confidence in the other, that on the donee's side superior knowledge exists as to the nature of the transaction proposed by him, as well as the detriment to be suffered by the donor if he engages in it, and the donee fails to see to it that the donor thoroughly understands its nature and consequences, equity should regard it as voidable at the instance of the donor or his representatives. In such a situation the donee must show by explicit and convincing evidence that the donor intended to make a present gift and unmistakably intended to relinquish permanently the ownership of the subject of the gift. [*In re Dodge, supra,* 50 *N.J.* at 228.]

The lower courts reached different conclusions concerning the validity of the transfer, primarily because of their different perceptions of the nature of the relationship between Pascale and David and of Berkowitz's conflict of interest. For its part, the trial court found both that Pascale had not established a confidential relationship with David and that Berkowitz was not in a position of conflict in representing both parties. Consequently, the court found that the proof did not give rise to a presumption that Pascale was a victim of undue influence.

The Appellate Division, however, found both that a confidential relationship existed between Pascale and David and that Berkowitz was in a position of conflict. Consequently, the Appellate Division found that the trial court had erred in "not plac[ing] upon David the burden of showing that his father fully understood the consequences of his act and had obtained

independent and competent advice with respect to the conse-
quences of the transfers." 216 *N.J.Super.* at 140.

Because of the difference in the factual findings of the trial
court and Appellate Division, we review the relative rules of
trial and appellate courts on factual findings. The conflicting
versions of the parties led the trial court to observe: "The trial
produced a morass of conflicting testimony. * * * As in virtu-
ally every sharply contested action, some testimonial conflicts
cannot be reconciled. This case is no exception, and the pivotal ·
findings and conclusions reached necessarily reflect my evalua-
tion of the significance of the various conflicts and inconsisten-
cies."

A case like the present one highlights the importance of the
traditional standard of appellate review that "[f]indings by the
trial judge are considered binding on appeal when supported by
adequate, substantial and credible evidence." *Rova Farms
Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974). Because a
trial court "hears the case, sees and observes the witnesses,
[and] hears them testify," it has a better perspective than a
reviewing court in evaluating the veracity of witnesses. *Gallo
v. Gallo*, 66 *N.J.Super.* 1, 5 (App.Div.1961). Thus, an appellate
court must "not disturb the factual findings and legal conclu-
sions of the trial judge unless [it is] convinced that they are so
manifestly unsupported by or inconsistent with the competent,
relevant and reasonably credible evidence as to offend the
interests of justice." *Rova Farms Resort, supra,* 65 *N.J.* at
484 (citing *Fagliarone v. Township of N. Bergen,* 78 *N.J.Su-
per.* 154, 155 (App.Div.1963). As this court has recognized,
however, "[t]here can be no doubt of the *power* of the appellate
tribunals of this State, certainly since the *Constitution* of 1947,
to review the fact determinations of a trial court in all cases
heard without a jury and to make new or amended findings."
*State v. Johnson*, 42 *N.J.* 146, 158 (1964).

With these precepts in mind, we turn to the differing percep-
tions of the lower courts concerning the existence of a confiden-

tial relationship between Pascale and David. The nature of a confidential relationship is difficult to define, but encompasses all relationships "whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists." *In re Fulper, supra,* 99 *N.J.Eq.* at 314. As the court stated in *Fulper,* a confidential relationship

> includes not only all cases of technical, legal, fiduciary relationship, such as guardian and ward, principal and agent, trustee and *cestui que trust,* but also all cases where trust and confidence actually exist. It comprehends * * * all cases where "the relations between the [contracting] parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from over-mastering influence; or on the other from weakness, dependence or trust justifiably reposed, unfair advantage is rendered probable." [*Ibid.* (quoting *Cowee v. Cornell,* 75 *N.Y.* 91, 99–100 (1878)).]

*Accord In re Dodge, supra,* 50 *N.J.* at 228. Among the most natural of confidential relationships is that of parent and child. *In re Fulper, supra,* 99 *N.J.Eq.* at 314; *see also Albright v. Burns,* 206 *N.J.Super.* 625, 635 (App.Div.1986) ("[a] fiduciary relationship may be deemed to have existed between [nephew and uncle] by reason of their closeness, family relationship, entrustment, the granting of the power of attorney and [the nephew's] promises that he would provide for his uncle.").

■ Notwithstanding Pascale's competence and vigor, the delegation of his financial and legal affairs to David bespeaks the trust and confidence that he reposed in his son. Moreover, David represented his father in all discussions with Berkowitz regarding Pascale's estate plan, and Pascale trusted him to develop a plan that was consistent with Pascale's intent. To this extent, we agree with the Appellate Division and disagree with the Chancery Division, which found that the relationship was not sufficiently confidential to give rise to the presumption of undue influence. Indeed, before us, David tacitly acknowledges that a confidential relationship existed between him and his father. The thrust of his argument is that he did not breach that relationship.

In finding that Pascale was not entitled to a presumption of undue influence, the trial court implicitly required proof that Pascale should have shown that his mind or will was sufficiently weakened to render him dependent on or servient to David. The Appellate Division, correctly we believe, found that the trust and confidence reposed by Pascale in David were sufficient to give rise to the presumption.

■ We now turn to the question of the conflict of interest on the part of the attorney, Berkowitz, in representing both David and Pascale at the time of the challenged transfer. Here, we also agree with the Appellate Division's assessment that Berkowitz was in a position of conflict in representing both parties. Berkowitz and his associate, Levitt, admitted that there was a conflict in the positions of David and Pascale concerning the ownership of the Quality stock prior to May 24, 1979. Moreover, David admitted Pascale was never informed of the services rendered by Berkowitz in preparing David's estate plan. Despite the fact that David told Berkowitz that he, not Pascale, owned the Quality stock on May 9, 1979, Berkowitz simultaneously represented David and Pascale. Neither Berkowitz nor David ever informed Pascale, however, of David's claim to the stock or that Berkowitz was now representing David. Nonetheless, the trial court found that "[a]t all times Berkowitz was Pascale's rather than David's attorney." The Appellate Division rejected that finding and found that Berkowitz was in a position of conflict because of his simultaneous representation of the parties. 216 *N.J.Super.* at 142. We agree.

As we have previously stated, "[a] lawyer cannot serve two masters in the same subject matter if their interests are or may became [sic] actually or potentially in conflict." *In re Chase*, 68 *N.J.* 392, 396 (1975). *Disciplinary Rule* 5–105(A), which was in effect at the time of the transaction, like present *Rule of Professional Conduct* 1.7, prohibited a lawyer from accepting or continuing employment "if the exercise of his independent

professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of" or continuance of the employment.[1]

---

[1]*Disciplinary Rule* 5–105 provided:

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

(C) In situations covered by DR 5–105(A) and (B) except as prohibited by rule, opinion, directive or statute, a lawyer may represent multiple clients if he believes that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the facts and of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment.

*Rule of Professional Conduct* 1.7 provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:

(1) the lawyer reasonably believes that representation will not adversely affect the relationship with the other client; and

(2) each client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

(c) This rule shall not alter the effect of case law or ethics opinions to the effect that:

(1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and

A conflict arises when an attorney represents in separate matters multiple clients who have adverse interests in at least one of those matters. "Developments in the Law—Conflicts of Interest in the Legal Profession," 94 *Harv.L.Rev.* 1244, 1296–1306 (1981). The attorney has divided loyalties that can prevent faithful representation of both clients in the matter in which the conflict arises. *Ibid.* For example, an attorney may not, without making appropriate disclosure, simultaneously represent the testator and the beneficiaries of a will. *Haynes, supra,* 87 *N.J.* at 181–85. Similarly, here, Berkowitz should not have represented Pascale on the transfer of real estate and stock to David without disclosing that he was simultaneously representing David on an independent matter. Even if Berkowitz believed he could adequately represent the interests of both Pascale and David, he failed to comply with the requirement of *Disciplinary Rule* 5–105(C) that he fully disclose the conflict.

Consequently, we agree with the Appellate Division that the conflicting claims to ownership of the Quality stock placed Berkowitz in a position of conflict arising from his dual representation of David and Pascale. On the same day, Berkowitz represented Pascale in the transfer of substantial assets to David and also represented David in the drafting and execution of his will. The conflicting claims of stock ownership, as the Appellate Division found, "raised an immediate conflict having the clear potential to raise in the mind of legal counsel the question as to which of the two masters was to be served and protected." 216 *N.J.Super.* at 142. In stating that the gift was invalid because the father did not receive "independent advice from an attorney free from any conflict," *id.* at 141, the Appellate Division, however, went too far. We believe that the

---

(2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

proper inquiry is whether David has shown by clear and convincing evidence that Pascale, notwithstanding the absence of independent counsel, understood the consequences of the property and stock transfers.

Even in the absence of Berkowitz's conflict of interest, the confidential relationship between David and Pascale gives rise to a presumption of undue influence that requires David to prove by clear and convincing evidence "not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood." *In re Dodge, supra,* 50 *N.J.* at 227 (quoting *In re Fulper's Estate, supra,* 99 *N.J.Eq.* at 302.

On this point, the trial court expressly found:

> Berkowitz discussed the alternate [estate] plan with David and with Schwartz and each of them in turn discussed it with Pascale who agreed. I am satisfied Pascale understood and appreciated the significance and consequences of the property and stock transfers.

> \*   \*   \*   \*   \*   \*   \*   \*

> On May 24, 1979, Berkowitz discussed in detail the change in plan with Pascale. Pascale understood the significance and consequences of the plan and agreed with its operative terms.

> \*   \*   \*   \*   \*   \*   \*   \*

> When he executed the documentation on May 24, 1979, Pascale knew and understood the import, effect and consequences of his signing these documents. His conduct on this date was consistent with his previously expressed intention to give "everything" to David and with his having lavished expensive gifts on David and David's wife over a substantial period of time. It was also consistent with his having executed a will (prepared by a different attorney than Berkowitz) on December 10, 1975, leaving his entire estate to David.

> \*   \*   \*   \*   \*   \*   \*   \*

> Even if Pascale were deemed to have succeeded in achieving this result [creating a presumption of undue influence] (which I expressly find has not occurred), I would conclude that defendants have demonstrated by clear, convincing and competent proof that Pascale's execution of the documents in issue was completed without deception or undue influence and that all of the circumstances of the execution were fair, open and voluntary and that Pascale understood the consequences of his actions.

In sum, we are confronted with a case in which the father did not have independent counsel in transferring to his son, with whom he had a confidential relationship, substantial assets, the transfer of which did not render the father destitute. The issue resolves to whether Pascale understood the consequences of what he was doing when he made those transfers. As the trial court made abundantly clear, Pascale was an experienced and shrewd businessman who, in making the transfer on May 24, 1979, completed a transaction that was consistent with his previously-expressed intention and with his last will and testament. He knew that he was voluntarily relinquishing control of Quality and, with full knowledge of the consequences, assumed the risk that David might terminate his employment. Included in his risk assessment was the tax benefits that would accrue from the transfers. In short, he knew what he was doing. The only mistake he made was in misjudging his ability to control his son and in failing to appreciate that once he executed the transfers, his future with Quality was under David's control.

Although it erred in not finding that the confidential relationship between Pascale and David gave rise to a presumption of undue influence, the trial court concluded that David had rebutted any such presumption by clear and convincing evidence. We perceive no reason to remand this matter to the trial court so that it can again find what it has already stated so clearly. To conclude, we accept the trial court's finding that defendants have rebutted the presumption of undue influence.

The judgment of the Appellate Division is reversed, and the judgment of the Chancery Division is reinstated.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.