**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0771-19

C.C.,[1]

    Plaintiff-Respondent,

V.

I.C.,

    Defendant-Appellant.

_____

Argued December 16, 2020 – Decided March 16, 2021

Before Judges Fuentes, Rose and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FV-14-0144-20.

Samuel J. Stoia, argued the cause for appellant.

Laurie A. Bernstein argued the cause for respondent.

PER CURIAM

_____

[1]  We use initials for the parties and witnesses to protect the plaintiff's confidentiality, R. 1:38-3 (d)(10), and pseudonyms for ease of reference.

Defendant I.C. appeals from a September 11, 2019 final restraining order (FRO) issued in favor of his estranged wife, plaintiff C.C., pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to - 35. At the time of trial, the parties were engaged in contentious divorce litigation, primarily concerning defendant's parenting time with the couple's three minor children.

On appeal, defendant challenges the credibility and factual findings of the Family Part judge, contending the evidence presented at trial did not support the conclusion that defendant intended to harass plaintiff within the meaning of N.J.S.A. 2C:33-4 and 2C:25-19(a)(13). Instead, defendant maintains the dispute between the parties "constituted marital contretemps." Defendant also challenges the judge's determination that the issuance of final restraints was necessary to protect plaintiff from immediate danger or further abuse by defendant. Having considered the record and the trial judge's cogent oral decision in view of the governing law, we affirm.

I.

During the two-day trial, both parties were represented by counsel and testified on their own behalf. Each party presented the testimony of one witness. Plaintiff's coworker, I.L. (Ida) testified on behalf of plaintiff. M.O. (Maria),

A-0771-19

who had been a mutual friend of the parties, testified on behalf of defendant concerning the allegations of prior domestic violence.

The parties were married in 2006 and have three daughters: twins A.C. and T.C. (Tina), born in 2008; and R.C., born in 2011. The parties separated on December 1, 2015, when plaintiff filed her first domestic violence complaint against defendant and was issued a temporary restraining order (TRO). Plaintiff claimed defendant struck her in the head after she refused his sexual advances, causing injuries to her eardrum and jaw that required medical attention.

Maria testified that in October or November of 2015, plaintiff called her and said defendant "had grazed her ear" after plaintiff struck defendant. Maria, who had known the couple for the duration of their marriage, said plaintiff had never mentioned any violence by defendant. But Maria acknowledged she had not spoken with plaintiff since December 2015 or January 2016.

On December 8, 2015, represented by their respective attorneys in a non-dissolution action, the parties entered into a civil consent order that: dissolved the TRO; imposed civil restraints; awarded primary residential custody to plaintiff; and addressed defendant's parenting time and financial obligations. The provision pertaining to civil restraints prohibited

> oral, written, personal, or other form of contact by either party with one another [sic] except solely (1)

non-abusive contact with respect to issues regarding the parties' three children and (2) to arrange for parenting time in accordance with the terms set forth herein, and (3) as mutually agreed so long as the communication remains non-abusive in accordance with this paragraph. For such purposes only, the parties shall be entitled to communicate via email or text messaging.

Apparently, the spirit of compromise reflected in the December 8, 2015 consent order was short lived. Plaintiff filed her second domestic violence complaint and was issued another TRO on January 19, 2016. The next day, defendant filed for divorce. Following trial in February 2016, a Family Part judge dismissed plaintiff's complaint and dissolved the TRO.[2]

Thereafter, multiple orders were issued in the Family Part dissolution matter modifying the terms of the parties' separation and parenting time. Notably, on March 7, 2017, the parties were directed to communicate only through the Our Family Wizard (OFW) computer application regarding the health, welfare, and well-being of their children. In addition to clarifying defendant's parenting time schedule and prohibiting overnight time, the March

---

[2] The January 2016 complaint and TRO are not contained in the record on appeal. In addition, according to defendant's merits brief, the parties filed cross-complaints alleging domestic violence and obtained TROs against each other in June 2016. Following trial in August 2016, another Family Part judge dismissed both complaints and dissolved the cross-TROs. The June 2016 complaints were not contained in the record on appeal, but plaintiff did not dispute those findings in her responding brief.

7, 2017 order required defendant to pick up and drop off the children "curbside at the marital residence."

At some point, the Division of Child Protection and Permanency (DCPP) became involved with the family. In November 2018, DCPP found both parties had emotionally abused their children due to their marital conflict. DCPP maintained supervision over the family.

The events that precipitated the filing of the present domestic violence complaint commenced on July 1, 2019, when the matrimonial judge denied defendant's request for equal parenting time. Although plaintiff did not dispute defendant's allegations that she had consumed alcohol and Xanax while the children were in her custody on June 26, 2019, the matrimonial judge denied defendant's application. Instead, the judge ordered plaintiff submit to a substance abuse evaluation and directed that her parenting time be supervised by her parents. Defendant testified he was "shock[ed]" by the judge's ruling. According to plaintiff, defendant thereafter engaged in an escalating pattern of frightful behavior.

On July 2, 2019, defendant parked in the driveway of the marital home and repeatedly rang the doorbell when he picked up the children, in violation of prior orders requiring him to do so curbside. Later that evening, defendant

A-0771-19

called 9-1-1, claiming plaintiff took away Tina's cellphone and the child was afraid "in case of an emergency" while in plaintiff's care.

According to the undisputed testimony at trial, two days later, on July 4, 2019, defendant called plaintiff's cell phone multiple times in violation of the March 7, 2017 court order requiring contact only through OFW. Defendant testified he called the police – not DCPP, which was assisting the family – for a welfare check that evening because one of his daughters said the children traveled in plaintiff's car without their grandparents. Defendant did not dispute that plaintiff's parents were traveling in the car behind her.

On July 10, 2010, the matrimonial judge removed the supervision requirement from plaintiff's parenting time but required her to install a landline telephone in the marital home for the children to contact defendant when they were in plaintiff's care. On July 14, 15, and 19, defendant violated the March 7, 2017 order that limited the parties' contact through OFW by repeatedly texting plaintiff and calling the landline.

According to plaintiff, on July 23, 2019, after returning the children to the marital home, defendant remained in his parked car, blocking the driveway, for a half hour. On cross-examination, defendant denied blocking the driveway.

6

By his own admission, defendant failed to return the children to plaintiff at the conclusion of his parenting time on July 30, 2019. Plaintiff contacted the police for assistance but was told "it's a civil matter and [she] need[ed] to go back to court." Police nonetheless contacted defendant, who said he kept the children due to "safety concerns." On July 31, 2019, defendant dropped off the children at the Bible camp they attended and where plaintiff worked.

On Thursday, August 1, 2019, defendant failed to return the children at the conclusion of his parenting time, claiming the children said plaintiff had "roughed up" Tina. On Friday, August 2, 2019, defendant emailed plaintiff, stating he intended to drive the children to Bible camp but that they would return with him at the end of the day. Defendant said he was "willing to accept any consequences the court may deem appropriate for [his] decisions."

Plaintiff ultimately contacted the police to file a domestic violence complaint on August 5, 2019. That morning, defendant brought the children to Bible camp, parked his car in the church's parking lot, and sat there for two-and-a-half hours. Plaintiff testified defendant positioned his car such that he could observe her during outdoor activities. Plaintiff said she was initially concerned because "parents don't sit in the parking lot during camp." She became nervous recalling defendant's email indicated he would take the children after camp.

7

"Now h[e wa]s physically there and at the bottom of the stairs where [she was] working." Among other things, plaintiff feared defendant's reaction if she "tried to take the kids on [her] own parenting day."

According to Ida, defendant positioned his car in a manner that allowed him to observe plaintiff as she exited the church during outdoor activities and plaintiff was "visibly shaken" by his presence. Defendant testified he was "on [his] laptop and [his] phone a little bit" looking for jobs online while sitting in the car.

Plaintiff's August 5, 2019 domestic violence complaint alleged defendant harassed her that day as described. Plaintiff alleged defendant's behavior had "escalated" since the parties' July 1, 2019 court date because he "wanted more parenting time." Plaintiff claimed defendant "blocked" her from exiting the driveway to the marital home and violated court orders by his presence on her property and calling her multiple times. Plaintiff also contended defendant "filed a false police report," alleging plaintiff "had a rifle in her home." In addition to these specific predicate acts, plaintiff described a history of domestic violence, including: the injuries she sustained to her eardrum when she refused to engage in sexual relations with defendant; that he "raped" her when they were

8

living together; and that he "made false claims using other agenc[ies] such as DCPP to harass [her]."[3]

At the conclusion of testimony, the judge admitted in evidence several exhibits introduced by both parties, including: prior Family Part orders; photographs of defendant outside the marital home on July 2, July 4, July 16, and July 23, 2019; photographs of defendant on the church grounds on August 5, 2019; text and email messages from defendant to plaintiff, and one of defendant's 9-1-1 calls to police.

After hearing closing arguments of counsel on September 5, 2019, the trial judge reserved decision. On September 11, 2019, the judge issued a thorough oral decision, squarely addressing the issues raised in view of the harassment statute and governing case law. The judge summarized the testimony of the parties and their witnesses and made detailed credibility findings.

The trial judge found plaintiff's testimony "credible in all respects." The judge elaborated:

> Her testimony was consistent with all documentary
> evidence produced and the reasonable interpretation of
> the documents produced, including, but not limited to

---

[3] On August 29, 2019, the matrimonial judge granted plaintiff's request for sole residential custody of the children, pending disposition of the August 5, 2019 TRO. Defendant's parenting time was limited to "supervised therapeutic visitation."

A-0771-19

court orders. Plaintiff attempted to answer all questions, both on direct and cross examination directly and completely. She also testified with great emotion that was consistent with the troubling nature of her testimony.

The judge therefore concluded the events that underscored her present domestic violence complaint, and defendant's history of domestic violence, occurred as she described them.

Commenting on defendant's testimony, the judge said defendant

was often evasive in providing responses during cross-examination. Rather than answer difficult questions and questions that may have had incriminating responses, he deflected those questions and provided his own self-serving narrative about plaintiff's substance abuse or the children's fears. . . . He seemed to recall details when convenient to his narrative but could not recall details that would have been unfavorable to him. He was also periodically combative on cross-examination.

The judge then detailed nine "of the many examples" that "reflect[ed] poorly on defendant's credibility." As one notable example, the judge found defendant's testimony on cross-examination "that he never sat outside . . . plaintiff's home for an hour and a half" conflicted with his July 2, 2019 call to police "that he sat outside for an hour and forty-five minutes trying to coax their daughter out of the car." Further, the judge "d[id] not find credible defendant's consistent refrain that he kept the children because they were afraid of plaintiff,"

10

noting plaintiff – and not defendant – contacted the police after the children allegedly said plaintiff "roughed up" Tina.

Turning to the parties' witnesses, the judge determined Maria's testimony was not "helpful." Having "appeared without being subpoenaed" the judge found Maria "seemed to have an affirmative agenda to protect . . . defendant." Citing her response to a question that called for a limited response, the judge found Maria "inexplicably" supplemented her answer "with additional narrative with the clear intent to cast . . . defendant in a more positive light." The judge therefore found "M[aria]'s testimony did not reasonably refute . . . plaintiff's claim that she suffered an injury as a result of an altercation with . . . defendant after she refused his sexual advances."

The judge credited Ida's testimony regarding plaintiff's demonstrable fear upon learning defendant was parked in the church lot on August 5, 2019. The judge found Ida's description "coincided with [his] observations during trial."

Accordingly, the judge rejected defendant's "testi[mony] that to the extent he violated court orders, his intent was to protect his daughters, who feared . . . plaintiff," and not to harass plaintiff. Instead, the judge determined defendant "engage[d] in [an] escalating pattern of conduct with the intent to cause plaintiff fear, annoyance, and alarm." In reaching his decision, the judge acknowledged

11

the history of Family Part orders that limited the parties' communications to texts and emails and subsequently only through OFW. Finding defendant committed acts of harassment after his application for equal parenting time was denied, the judge concluded plaintiff established by a preponderance of the credible evidence the predicate acts of harassment, N.J.S.A. 2C:33-4(a) and (c) and N.J.S.A. 2C:25-19(a)(13). The judge also determined that entry of the FRO was required "to protect . . . plaintiff from immediate danger and further abuse and acts of domestic violence." This appeal followed.

II.

Our limited scope of review of a trial court's findings of fact is well established. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). "[W]e grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We will not disturb the court's factual findings and legal conclusions "unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (internal quotation marks omitted).

A-0771-19

Deference is particularly appropriate here, where the evidence is largely testimonial and hinges upon a court's ability to make assessments of credibility. Ibid. It is axiomatic that the judge who observes the witnesses and hears the testimony has a perspective the reviewing court simply does not enjoy. See Pascale v. Pascale, 113 N.J. 20, 33 (1988). We also accord deference to the factual findings of Family Part judges because that court has "special jurisdiction and expertise in family matters, . . . ." Cesare, 154 N.J. at 413. Conversely, a trial judge's decision on a purely legal issue is subject to de novo review on appeal. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007).

The entry of an FRO requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The trial court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402).

Secondly, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further

13

abuse." Silver, 387 N.J. Super. at 127 (citing N.J.S.A. 2C:25-29(b) (stating, "[i]n proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse")); see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011). Those factors include – but are not limited to – "[t]he previous history of domestic violence between the [parties], including threats, harassment and physical abuse[,]" N.J.S.A. 2C:25-29(a)(1), and "[t]he existence of immediate danger to person or property . . . ." N.J.S.A. 2C:25-29(a)(2).

The Act identifies predicate acts of domestic violence, which include harassment as defined by N.J.S.A. 2C:33-4. N.J.S.A. 2C:25-19(a). Pertinent to this appeal, N.J.S.A. 2C:33-4 provides:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he:
>
> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm; [or]
>
> . . . .
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

In the present matter, the trial judge concluded defendant violated N.J.S.A. 2C:33-4(a) by "threat[ening] to call the police, phone calls and texts to plaintiff when prohibited, [and] emails advising her he would not provide plaintiff with court-appointed parenting time." Regarding subsection (c), the judge found defendant "improper[ly] ent[ered] onto plaintiff's property on July 2[, 2019,] in violation of court orders"; "intentionally and improperly summ[oned] the police to the house on [the same date] without legitimate fear that the children were in danger"; "improperly call[ed] the police on numerous [other] occasions"; and "attempt[ed] to exercise coercive control of plaintiff" on numerous occasions.

Citing our decision in State v. J.T., the judge also found defendant exercised "coercive control" over plaintiff by remaining in the church parking lot while she was working. 294 N.J. Super. 540, 544-45 (App. Div. 1996) (affirming trial court's finding of harassment where a defendant sat outside the victim's home in her sight, ignoring a prior court order prohibiting contact with the victim). Citing Cesare,[4] the judge correctly recognized any of those acts committed individually, might not constitute harassment. See 154 N.J. at 413-

---

[4] The transcript indicates the trial judge cited "Sanzari v. Sanzari," but no such case exists in New Jersey.

Here, "viewed cumulatively and in the context of the parties' high-conflict relationship and antagonistic history," the judge found defendant's actions were made with the intention of causing plaintiff alarm and annoyance.

The history cited by the judge, along with his specific findings regarding defendant's course of conduct between July 1, 2019 and August 5, 2019 serves to distinguish this case from those upon which defendant relies to argue that the evidence supported only a finding of marital contretemps. Cf. R.G. v. R.G., 449 N.J. Super. 208, 229-30 (App. Div. 2017) (finding no harassment when the defendant brother sent several strongly worded, uncouth emails to the plaintiff); E.M.B. v. R.F.B., 419 N.J. Super. 177, 183-84 (App. Div. 2011) (finding no harassment when the defendant stole his mother's car keys, jewelry, cellphone, money and other items). In both of those cases – unlike the present matter – we found there was a lack of prior domestic violence history. R.G., 449 N.J. Super at 229; E.M.B., 419 N.J. Super. at 183.

We acknowledge that the precipitating events leading to the domestic violence complaint in this case arose contemporaneously with the parties' divorce action. In similar circumstances, we have cautioned:

> [t]he Act is intended to assist those who are truly the victims of domestic violence. It should not be trivialized by its misuse in situations which do not involve violence or threats of violence. In addition, we

16

> have previously expressed our concern that the Act may be misused in order to gain advantage in a companion matrimonial action or custody or visitation action.
>
> [Kamen v. Egan, 322 N.J. Super. 222, 229 (App. Div. 1999).]

Here, however, the trial judge considered the extensive testimony adduced at the domestic violence trial and fully assessed the credibility of the parties. We conclude the judge's determination that defendant had engaged in harassment was fully supported by the trial record. Given our deferential standard of review, we discern no basis to disturb that finding.

Moreover, the judge's determination that an FRO was necessary to protect plaintiff was well-founded. As already noted, the judge found defendant's conduct was not simply an isolated incident. He further found credible plaintiff's testimony that defendant had physically assaulted her in the past, causing injury. Moreover, the judge found defendant "ignored" the Family Part orders imposing civil restraints. Under the totality of circumstances presented, the issuance of the FRO was appropriate for plaintiff's protection.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0771-19