**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3486-17T4

L.G.,

 Plaintiff-Respondent,

v.

T.G.,

 Defendant-Appellant.

_____

   Submitted February 5, 2019 – Decided March 12, 2019

   Before Judges Fisher and Firko.

   On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FV-13-0623-18.

   Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys for appellant (Jessica N. Mazur, of counsel and on the brief).

   Respondent has not filed a brief.

PER CURIAM

Following a two-day final hearing addressing both parties' complaints under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 – and during which the parties were engaged in contentious divorce litigation – the trial judge rendered a thorough oral decision concluding that plaintiff, L.G.,[1] was entitled to, and in need of, a final restraining order (FRO) against her husband T.G. The judge also dismissed T.G.'s domestic violence cross-complaint.

T.G. appeals, arguing:

> I. THE TRIAL COURT ERRED IN FINDING THE DEFENDANT COMMITTED THE DOMESTIC VIOLENCE ACT OF STALKING BECAUSE THE DEFENDANT DID NOT PLACE THE GPS DEVICE ON THE VEHICLE TITLED IN HIS NAME BUT DRIVEN BY THE PLAINTIFF.

> II. THE TRIAL COURT ERRED IN FINDING THE DEFENDANT COMMITTED HARASSMENT AS AN ACT OF DOMESTIC VIOLENCE BECAUSE THE DEFENDANT'S PURPOSE WAS NOT TO HARASS OR ANNOY BUT RATHER DEFENDANT WAS GENUINELY CONCERNED FOR THE SAFETY OF HIS CHILDREN WHILE TRAVELING OUT OF TOWN FOR BUSINESS DUE TO THE PLAINTIFF'S BEHAVIOR INCLUDING HER FREQUENT ATM WITHDRAWALS.

---

[1] We use initials to protect the identities of the parties. R. 1:38-3(12).

A-3486-17T4

III.   THE TRIAL COURT SHOULD NOT HAVE ISSUED A FINAL RESTRAINING ORDER EVEN IF THE DEFENDANT DID COMMIT STALKING OR HARASSMENT BECAUSE THE PRIOR HISTORY WAS INSUFFICIENT TO SUPPORT HER REQUEST FOR A FINAL RESTRAINING ORDER.

IV.   THE TRIAL COURT SHOULD NOT HAVE ISSUED A FINAL RESTRAINING ORDER EVEN IF THE DEFENDANT DID COMMIT STALKING OR HARASSMENT BECAUSE THERE WAS A FAILURE TO SHOW A NEED FOR PROTECTION FROM FUTURE ACTS OF DOMESTIC VIOLENCE.

We find insufficient merit in these arguments and we affirm substantially for the reasons set forth by Judge Gregory L. Acquaviva in his comprehensive and well-reasoned oral decision.[2]  We add only a few comments.

I.

The institution of a domestic violence matter while the parties are engaged in matrimonial litigation always raises a cause for concern that the former might have been instituted by a party to gain an upmanship in the latter.  Family judges cognizant of that potential must ensure, before entering a final restraining order, that a party's predicate acts, such as stalking and harassment, when sustained, constitute more than mere domestic contretemps.  See, e.g., J.D. v. M.D.F., 207 N.J. 458, 475 (2011); Corrente v. Corrente, 281 N.J. Super. 243, 250 (App. Div.

---

[2]  An order was entered suppressing an appellate brief from L.G.

A-3486-17T4

1995).  Judge Acquaviva considered this possibility and concluded T.G.'s particularly egregious acts of harassment, coupled with an "extensive prior history of domestic violence," warranted an FRO.  We defer to the judge's thoughtful findings on this subject because those findings were solidly grounded on the judge's credibility findings – he found L.G. much more credible than T.G., who was evasive – as well as other reliable evidence.  See Cesare v. Cesare, 154 N.J. 394, 411-12 (1998).  The judge also found T.G. stalked and harassed L.G. and she is in need of continuing protection.

## II.

The parties were married in 2004 and L.G. filed a complaint for divorce in July 2017.  Financial problems led to the demise of the marriage ostensibly because of L.G.'s spending habits, according to T.G.  He claims she withdrew monies from a joint bank account, their daughter's account, his inheritance account, and she made excessive credit card charges all adding up to $250,000 requiring him to put her on a budget of $1000 per week, $500 in cash and $500 by checks.  Because of her alleged reckless spending, T.G. closed the joint bank account, which precipitated an argument leading to the issuance of the first temporary restraining order (TRO) in favor of L.G. "for conduct arising out of a phone call on May 3rd when [T.G.] was in a hotel room [and L.G.] was at

A-3486-17T4

home." Simultaneously, a series of text messages were exchanged, and T.G. inquired as to L.G.'s credit card charges at Nordstrom and United Airlines in respect of a Turks and Caicos vacation.

In terms of prior history for issuance of the FRO, the judge found that a "volatile" phone call transpired; that there were mutual assaults; that T.G. pushed L.G. to the floor, pinned her down, and threatened her by saying, "do you know what just one punch would do to your face?" Notwithstanding these occurrences, the initial TRO was dismissed and T.G. returned to the martial residence in June 2017, but frequently slept at his father's home. Before filing the divorce complaint, T.G. attended seven anger management counseling sessions, and the parties engaged in marriage counseling.

In October 2017, T.G. authorized his father to retain All State Investigation to conduct surveillance on L.G., including installation of a GPS tracking device on the vehicle she drove, registered in T.G.'s name, that provided "real time monitoring and a report provided daily to [T.G.]." At trial, the judge found T.G. admitted to having the GPS installed, but that he was evasive as to whether visual surveillance was implemented, leading the judge to conclude his testimony "lacked credibility on this point."

Anthony DeLorenzo, the owner and senior investigator of All State Investigation, testified that, "I believe 100 percent they were both involved," referring to T.G. and his father.  Overall, the judge found DeLorenzo incredulous, but on this point, he was found credible because it was a "moment of candor . . . at the end of . . . a withering interrogation in the context of whether it was common . . . for a spouse to use a parent as a proverbial middle man for retention of services."  The authenticating testimony and evidence relative to the GPS monitoring was meticulous, as found by the judge, who noted that the testifying police officers were "extraordinarily well prepared."  After learning of the GPS and surveillance, L.G. credibly testified that she was "afraid" of T.G.; she felt "mocked"; and that her privacy was invaded.

Before discovering the GPS, T.G. questioned L.G. about her whereabouts and confronted her stating, "do you have anything to tell me?" and "you're in Marlboro a lot . . . .  I'm going to get to the bottom of it . . . .  I just know."  Upon discovering the GPS later that day, L.G. testified that she feared T.G. would "go after her."  She called him a "dead man," told him that she was "going to fuck [him] up," and that she wanted to see him "squirm," leading to the issuance of her TRO.  The investigating officer, Michael Migdon of the Howell police department, testified that L.G. appeared "concerned, nervous and scared," and

T.G. refused to answer questions about the GPS. After further investigation, Officer Migdon testified there were eighty-eight successful logins after the device was installed, which had "real time GPS tracking" via a wireless network.

In his decision, Judge Acquaviva found L.G. "to be credible by and large with her testimony . . . and the recounting of that day, uncovering the GPS[,]" and that she had a "distinct recollection" of phrases uttered when she spoke to T.G. Conversely, the judge found T.G. was "incomplete and not forthcoming" when testifying about the GPS, and he showed "noticeable discomfort, sweating even at the beginning and just a shocking lack of curiosity about a lot of the particulars . . . ." When testifying about his children, the judge found T.G. was "extraordinarily credible."

An FRO was issued to L.G. T.G.'s TRO was dismissed because the judge determined that the parties' communications set forth in his complaint were "legitimate conversations" and "marital contretemps," not harassment. In this appeal, T.G. challenges the issuance of an FRO in favor of L.G. but not the dismissal of his TRO.

### III.

The appellate court's scope of review in this circumstance is limited. Cesare, 154 N.J. at 411. A trial court's fact-finding should be upheld unless it

is not supported by "adequate, substantial and credible" evidence. <u>Pascale v. Pascale</u>, 113 N.J. 20, 33 (1988) (quoting <u>Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.</u>, 65 N.J. 474, 484 (1974)). A family court's fact-finding is afforded deference due to its "special jurisdiction and expertise in family matters . . . ." <u>Cesare</u>, 154 N.J. at 413. The trial court has the ability to "hear the case, see and observe the witnesses, [and] hear them testify," providing it with a "better perspective than a reviewing court in evaluating the veracity of witnesses." <u>Pascale</u>, 113 N.J. at 33 (fourth alternation in original) (quoting <u>Gallo v. Gallo</u>, 66 N.J. Super. 1, 5 (App. Div. 1961)).

This court, however, owes no special deference to the trial court's legal interpretation of a statute, or "the legal consequences that flow from established facts . . . ." <u>Hayes v. Delamotte</u>, 231 N.J. 373, 387 (2018) (quoting <u>Manalapan Realty, LP v. Manalapan Twp. Comm.</u>, 140 N.J. 366, 378 (1995)).

Pursuant to N.J.S.A. 2C:12-10(b):

> [a] person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress.

For the purposes of this statute:

(1) "Course of conduct" means repeatedly maintaining a visual or physical proximity to a person; directly or <u>indirectly</u>, or <u>through third parties</u>, by any action, method, <u>device</u>, or means, <u>following</u>, <u>monitoring</u>, <u>observing</u>, <u>surveilling</u>, threatening, or communicating to or about a person, or <u>interfering with a person's property</u>; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct of a combination thereof directed at or toward a person.

(2) "Repeatedly" means on two or more occasions.

(3) "Emotional distress" means significant suffering or distress.

(4) "Cause a reasonable person to fear" means to cause fear which a reasonable victim, similarly situated, would have under the circumstances.

[N.J.S.A. 2C:12-10(a) (emphasis added).]

T.G. argues that his authorization to place a GPS on L.G.'s car does not constitute stalking because he did not personally install it; he never threatened her; he did not personally maintain visual and physical proximity to her; and that his behavior was not persistent because it occurred over a one week period. Our Supreme Court held "that the Legislature intended to cast a wide net of protection for stalking victims by broadly prohibiting and punishing persistent,

9

unwanted, and frightening behaviors." State v. Gandhi, 201 N.J. 161, 187 (2010).

The stalking statute was implemented "to intervene in repetitive harassing or threatening behavior before the victim has actually been physically attacked." H.E.S. v. J.C.S., 175 N.J. 309, 329 (2003) (quoting State v. Saunders, 302 N.J. Super. 509, 520 (App. Div. 1997)). Therefore, "acts of actual violence are not required to support a finding of domestic violence." Ibid. Granting an FRO to a victim of stalking "furthers the . . . Act's goal of 'assur[ing] the victims of domestic violence the maximum protection from abuse the law can provide.'" Ibid. (alteration in original) (quoting Cesare, 154 N.J. at 399).

In H.E.S., a TRO against a husband was upheld based upon stalking because he covertly placed surveillance cameras in her bedroom. He also argued that his conduct did not constitute stalking because he did not behave in a threatening manner. Id. at 328. The Court held that the presence of cameras constituted repeated action because it took place "over a sufficient period or on a sufficient number of occasions to establish a 'course of conduct' under the statute." Id. at 329 (quoting H.E.S. v. J.C.S., 349 N.J. Super. 332, 350 (App. Div. 2010)).

T.G. attempts to distinguish <u>H.E.S.</u> from his conduct because the GPS was placed on L.G.'s vehicle "in order to know her whereabouts, not to film her every move in the bedroom, a place which other than the bathroom holds the highest expectation of privacy." But the GPS remained on L.G.'s vehicle for nearly a month before she discovered it, and was it logged into eighty-eight times to retrieve data. Records provided by DeLorenzo indicated approximately 391 updates on L.G.'s whereabouts during the time in question, and that she was physically followed for at least three days. The judge aptly found that a "reasonable person similarly situated could fear for his or her safety and suffer emotional distress" if a private investigator was hired and provided with a license plate number, as T.G. did here.

T.G.'s actions were clearly directed at L.G. We are not persuaded by his argument that he didn't place the device on L.G.'s vehicle, but authorized his father to employ a private investigator to do so. Indirectly and through a third-party, T.G. had L.G. followed, monitored, observed, and surveilled, by using a device in violation of N.J.S.A. 2C:12-10(a). The evidence amply supports the judge's finding that L.G. was monitored over a sufficient period of time, establishing a repeated course of conduct within the meaning of the statute. We see no basis to disturb the judge's findings as to stalking.

A-3486-17T4

IV.

We next turn to T.G.'s argument that the judge erred in finding harassment as a predicate act. Pursuant to the statute, harassment is committed if a person:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or <u>any other manner likely to cause annoyance or alarm</u>;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course <u>of alarming conduct</u> or of <u>repeatedly committed acts with purpose to alarm or seriously annoy</u> such other person.
>
> [N.J.S.A. 2C:33-4 (emphasis added).]

T.G. argues that he did not use coarse language in questioning L.G.; that the import of the questions related to finances; and the morning hour when the conversation occurred was not inconvenient because they were both already awake. In considering the totality of the circumstances, the <u>H.E.S.</u> Court held that, "'[a] finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." <u>H.E.S.</u>, 175 N.J. at 327 (quoting <u>State v. Hoffman</u>, 149 N.J. 564, 585 (1997)). The focus is on defendant's "purpose, motive, and intended use of information obtained through visual and audio surveillance of plaintiff's private acts . . . ." <u>Ibid.</u>

12                                                          <span>A-3486-17T4</span>

The commission of a predicate act of harassment does not automatically warrant the issuance of an FRO. Corrrente, 281 N.J. Super. at 248. Defendant's conduct "must be evaluated in light of the previous domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse and in light of whether immediate danger to the person or property is present." Ibid. (citing N.J.S.A. 2C:25-29(a)(1) and (a)(2)).

The judge properly determined that placement of the tracker did not constitute harassment because it was "designed to never be detected . . . [and] not with the purpose to harass." But the judge aptly made the distinction that the information obtained through the GPS led to T.G. intentionally harassing L.G., and, "to intimidate her, to try to trap her." The judge further held:

> the odd inquisition . . . of the questions being asked by [T.G.] of [L.G.] before he left the house. The phone calls throughout the day about where are you. That is the harassing conduct here. And the whereabouts and paranoia about the whereabouts existed all summer. But we do have on November 13th, an odd inquisition in the morning, repeated concern about the whereabouts throughout the morning. And effort here not by the placing of the GPS tracker, but about the use of the information that was obtained from the GPS tracker was designed to isolate [L.G.], to trap her and viewed in its totality, there was a purpose to harass another. And I do find that is of the nature to be likely to cause alarm or serious annoyance.

In applying the statute, "harass" must be given its ordinary meaning, namely to annoy, torment, wear out, or exhaust the intended victim. State v. Castagna, 387 N.J. Super. 598, 607 (App. Div. 2006). A "victim's subjective reaction alone will not suffice; there must be evidence of the improper purpose." J.D., 207 N.J. at 487.

We have no difficulty in affirming the judge's finding that T.G. committed the predicate act of harassment by using information gathered by the GPS.

V.

In his final argument, T.G. argues that L.G. failed to prove "regular serious abuse" to justify the issuance of an FRO. We stated in Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006) that the issuance of an FRO does not inexorably follow from the finding of a predicate act. The court must engage in a separate inquiry regarding the need for restraints. 387 N.J. Super. at 126-27:

> This second inquiry, therefore, begins after the plaintiff has established, by a preponderance of the evidence, the commission of one of the enumerated predicate acts "upon a person protected under this act by an adult or an emancipated minor[.]" N.J.S.A. 2C:25-19[(a)]. Although this second determination – whether a domestic violence restraining order should be issued – is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the facts set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse.

See N.J.S.A. 2C:25-29[(b)] (stating that "[i]n proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse") (Emphasis added).

[Id. at 127.]

The judge properly performed the second inquiry here and considered the factors set forth in N.J.S.A. 2C:25-29(a)(1) to 29(a)(6) to protect L.G. from immediate danger and to prevent further abuse. These factors are:

> 1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> 2) The existence of immediate danger to person or property;
>
> 3) The financial circumstances of the plaintiff and defendant;
>
> 4) The best interests of the victim and any child;
>
> 5) In determining custody and parenting time the protection of the victim's safety; and
>
> 6) The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a)(1)-(a)(6).]

The trial judge considered all six factors. He found that there was physical violence between the parties and that the stalking and harassment "were over a period of time where the information on the stalking was used in a harassing

A-3486-17T4

nature."  He was particularly concerned with the March 2017 incident where T.G. said "do you know what one punch will do to your face?"  Next, the judge determined that L.G. credibly testified that she is fearful and "still feels nervous and needs the protection of a[n] [FRO] in order to feel safe with her kids."  She enrolled in a domestic violence program for women supporting her fear, leading the judge to conclude "there [was] some level of immediate danger based on that reasonable fear."

L.G. testified that she:

> was and remain[s] concerned for [her] safety and . . . [that] leading up to October, November, he would ask [her] questions that [she] thought were very odd after being married to him for so long.  He wanted . . . access to [her] phone.  He wanted [her] to log in.  He wanted [her] to turn over [her] phone.  He wanted to know [her] whereabouts.  He wanted to know who [she] was with.  He would mock the friends that [she] [said] that [she] was with, who were most of the times other moms from Marlboro where [they] had lived previously.  He would, in [her] opinion, try to isolate [her] from [her] own personal life and then the situation that he wanted to control over what was going on in [their] house until the divorce was fin[al].

The record reflects that the first complaint alleged T.G. told L.G. that "she was lucky he was out-of-state and could not get to her, because they would have to call security."  He also threatened her by "reminding her as to how strong and

much bigger he is."[3]  In her amended complaint, L.G. asserted that after T.G. pinned her to the ground, he threw her phone against the wall cracking its screen as she attempted to call the police.  In considering the financial circumstances of the parties, the judge found L.G. is a stay-at-home mother and T.G. is the "breadwinner," further leading to his controlling and manipulative behavior.

We are satisfied that the judge relied upon sufficient credible evidence in the record to find "regular serious abuse" between the parties and appropriately considered L.G. to be a victim of past domestic abuse.

T.G.'s remaining arguments lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).  Suffice it to say, the judge specifically found that T.G.'s use of the GPS device, whether directly or indirectly, to keep track of L.G.'s personal life, necessitated an FRO to protect her from such conduct in the future.  The judge also correctly found that T.G.'s conduct was directed at L.G., N.J.S.A. 2C:12-10(b), and constituted harassment because he accomplished his mission in obtaining her personal and private information.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3]  The pleadings state that T.G. is six-feet tall and weighs 175 pounds; L.G. is five-feet-seven inches tall and weighs 135 pounds.

A-3486-17T4