**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2970-16T4

THE ESTATE OF JEFFREY
APPELBLATT (Deceased),
by STEPHANIE REBECCA
APPELBLATT, Executrix,

      Plaintiff-Respondent/
      Cross-Appellant,

and

MAX J. APPELBLATT,
BENJAMIN M. APPELBLATT,
SARAH N. APPELBLATT, and
JACOB W. APPELBLATT,

      Plaintiffs/Intervenors-
      Respondents/Cross-Appellants,

v.

ARLETTA ASATRIAN,

      Defendant-Appellant/
      Cross-Respondent.

_____

Argued September 13, 2018 - Decided September 11, 2019

Before Judges Fuentes, Accurso and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. C-000127-15.

Eric D. McCullough argued the cause for appellant/cross-respondent (Waters, McPherson, McNeill, PC, attorneys; Eric D. McCullough, of counsel and on the briefs).

Catherine L. Sakach argued the cause for respondents/cross-appellants (Matteo Wisniewski, LLC, attorneys; Catherine L. Sakach, of counsel and on the brief).

PER CURIAM

This is a suit over the proceeds of a $750,000 life insurance policy. Defendant Arletta Asatrian appeals from a final judgment awarding her the proceeds of the policy less $329,238.20 the Probate Part judge found the decedent Jeffrey Appelblatt gifted her from funds wrongly diverted from marital assets belonging to him and his wife Stephanie Appelblatt, now the executrix of his estate. Plaintiffs, the Estate of Jeffrey Appelblatt and the Appelblatt's four children, as intervenors, appeal from the judgment awarding the proceeds of the policy to Asatrian. Because the estate has no right to funds Jeffrey gifted to Asatrian during his lifetime, we reverse the judgment in favor of the estate. We also reverse the judgment in favor of Asatrian based on Stephanie's changing the beneficiary on the policy from Asatrian to the Appelblatt children as Jeffrey's lawful attorney-in-fact after his incapacity. We remand to the trial court for

2

further proceedings as may be necessary to implement our decision and establish an appropriate support award for Asatrian and Jeffrey's daughter, four-years-old at the time of Jeffrey's death.

Jeffrey and Stephanie Appelblatt married in 1993 and had four children. Jeffrey ran a successful business selling commercial cleaning supplies. Stephanie cared for the children and managed their home life. The couple together owned the commercial property housing Jeffrey's business through a limited liability company, SMBJ Realty, LLC, an acronym formed from the first initials of their children's names.

In January 2014, after Jeffrey had begun to suffer what appeared to be neurological problems, he confessed to Stephanie that he had been seeing another woman for ten years, defendant Arletta Asatrian, and had a three-year-old daughter. Jeffrey and Stephanie's oldest child was then in her first year of college, their second child was concluding his senior year of high school and their sixteen-year-old twins were juniors in high school. Following his revelation, Jeffrey's health went into rapid decline and he was at some point diagnosed with Creutzfeldt-Jakob disease.[1]

---

[1] Creutzfeldt-Jakob disease (CJD) is

A-2970-16T4

Jeffrey's deteriorating health caused immediate financial problems for both Stephanie and their children, as well as Asatrian and their daughter. Stephanie testified at trial that Jeffrey's business was completely dependent on his attention to sales, and his inability to work had a devastating effect on the business's viability. During the year of his illness, Stephanie was forced to withdraw over $85,000 from the couple's retirement accounts and borrow $48,000 against a joint life insurance policy to make their more than $8000 monthly mortgage payments and pay for the two oldest children's college tuitions. In March 2014, Asatrian filed an FD action for child support as Jeffrey had stopped providing her funds in February.

---

a rare, degenerative, fatal brain disorder. It affects about one person in every one million per year worldwide; in the United States there are about 350 cases per year. CJD usually appears in later life and runs a rapid course. Typical onset of symptoms occurs at about age 60, and about 70 percent of individuals die within one year. In the early stages of the disease, people may have failing memory, behavioral changes, lack of coordination, and visual disturbances. As the illness progresses, mental deterioration becomes pronounced and involuntary movements, blindness, weakness of extremities, and coma may occur.

[Creutzfeldt-Jakob Disease Fact Sheet, NIH.gov, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Creutzfeldt-Jakob-Disease-Fact-Sheet (last visited August 27, 2019).]

Asatrian testified she met Jeffrey in 2002 when he signed up for tennis lessons at a Fort Lee club where she was teaching. She had just immigrated to the United States from Armenia with her seven-year-old daughter, having separated from her husband some years before. Their affair began in 2003.

Asatrian testified that Jeffrey provided her significant sums of money over the course of their relationship. When she bought a house in Tenafly in 2007, Jeffrey gave her $52,300 for the down payment and contributed $2000 a month to her $3600 monthly mortgage payment. After their daughter was born in 2010, Jeffrey assumed the entirety of the mortgage payments. He also paid $900 a month for preschool and $400 a month for the lease of Asatrian's BMW X3. Asatrian also testified that Jeffrey told her in 2006 he had made her the beneficiary of a life insurance policy so she would be financially independent if anything happened to him.

Although Stephanie had retained counsel for Jeffrey, no one appeared on his behalf at the initial hearing on Asatrian's child support application in June 2014. Counsel for Asatrian represented to the Family Part judge that a lawyer for Jeffrey had advised that Jeffrey had dementia, that there were two doctor's reports and that he would be filing a guardianship action, but counsel had not seen the reports or been advised of any filing and was thus proceeding "as though

this is an ordinary case." Counsel also represented that Stephanie had been voluntarily paying $1000 a month temporary support on Jeffrey's behalf.

After hearing testimony from Asatrian, the Family Part judge entered an order granting her request for pendente lite support of $2500, the maximum provided by the child support guidelines, plus $700 per month for child care and $400 for her car lease. Asatrian did not disclose she was already receiving $1800 a month in Social Security benefits through Jeffrey on their daughter's behalf. The judge granted Asatrian's request to maintain the status quo in that she be continued as the primary beneficiary on Jeffrey's $750,000 life insurance policy and that he continue to pay the premiums and not borrow against the policy.

By the time that order was entered, however, Stephanie had already arranged for Jeffrey to change the beneficiary from Asatrian to Jeffrey and Stephanie's children. Stephanie testified at trial that when Jeffrey advised her of the existence of the policy shortly after he told her of the affair, she told him he should make their children the beneficiaries. According to Stephanie, Jeffrey told her he would think about it. Although that was the only conversation the two ever had about the policy, a few months later Stephanie filled out a change of beneficiary form and sent it to Jeffrey's bookkeeper. Jeffrey executed the

6

form on May 19, 2014, witnessed by his bookkeeper. Stephanie acknowledged she was driving Jeffrey to work at that point as he was unable to drive and could not work at full capacity. The carrier acknowledged the change on May 28.

Stephanie testified she executed a change of beneficiary form a month later, pursuant to a durable power of attorney she held for Jeffrey, changing the beneficiary back to Asatrian at the direction of the lawyer she retained for Jeffrey pursuant to the Family Part order. She testified she continued to pay the premiums on that policy as well as the pendente lite support to Asatrian as ordered by the court. According to Stephanie, premiums for the policy totaled $34,738.20

Jeffrey died in January 2015 at home. Stephanie testified she and their children cared for him after he became unable to care for himself several months prior to his death. At a previously scheduled case management conference in the FD matter eleven days after Jeffrey died, counsel retained by Stephanie learned Asatrian had already made a claim for benefits under the insurance policy and asked the court to enjoin payment of the proceeds to her. Because the insurance carrier was not a party and the claim had already been made, the court instead ordered Asatrian to deposit the proceeds into three FDIC insured accounts in trust for her daughter and limited her access to the funds to the $3600

A-2970-16T4

per month previously ordered. The court then dismissed the case, ordering all further proceedings to be litigated in the Probate Part.

Stephanie, as executrix of Jeffrey's estate, thereafter instituted this action against Asatrian to impose a constructive trust on the proceeds of the $750,000 insurance policy as well as on Asatrian's Fort Lee co-op, which she purchased with the proceeds of the sale of the Tenafly home that Jeffrey financed with marital funds. Stephanie also sought an accounting of all funds Jeffrey provided to Asatrian and the establishment of an appropriate support award for their daughter. The Probate Part judge permitted Jeffrey and Stephanie's children to intervene as plaintiffs, and they filed a separate complaint for a declaratory judgment deeming them the rightful beneficiaries of the $750,000 insurance policy based on their father having made them the beneficiaries in May 2014. They also requested that the Family Part order requiring Asatrian to continue as beneficiary be declared void as to the policy.

Trial took place over two days, at which Stephanie and Asatrian testified to the facts set forth above. In addition, Stephanie testified regarding the durable power of attorney, attached as an exhibit to the estate's verified complaint, which Jeffrey executed in 2000, making her his attorney-in-fact, and to the estate's assets and liabilities. Specifically, she testified the estate's assets consisted

almost solely of a $3 million life insurance trust of which she was the income beneficiary and her children the remainder beneficiaries. Stephanie testified the trust was paying the family's living expenses and all four children's college tuitions, as there were no other assets to tap. At the time of trial, both Stephanie and her trustee testified that only $1.2 million remained in that trust.

Stephanie testified she had been unsuccessful at salvaging Jeffrey's business and it was essentially valueless, with a pending $800,000 claim against it by its main product supplier. The commercial property housing the business was in foreclosure. Asked on cross-examination whether she agreed "that Jeffrey should buy housing" for his daughter with Asatrian, Stephanie replied that Jeffrey "should have paid child support for [his daughter] period whether it included the house or cereal on the table."

Asatrian testified to her relationship with Jeffrey and his devotion to their daughter. She claimed she did not know Jeffrey was married and was shocked to learn he was in his sixties and not in his forties as she claimed he represented. According to her, Jeffrey claimed he was divorced and had custody of his four children. In response to questions from the court, Asatrian testified she never knew where Jeffrey lived during their entire ten-year relationship. When the court asked whether she thought it strange that Jeffrey had never invited her to

his home, she responded that Jeffrey explained he lived with his children and told her it was "not [a] good time for me to be introduced."

Asatrian also testified to the monies Jeffrey provided her over the course of their relationship. In addition to the down payment on her Tenafly home, her mortgage payments and car lease payments, Asatrian identified four checks she received from Jeffrey, two for $12,900 drawn on his personal checking account and two drawn on an account belonging to the limited liability company he owned with Stephanie, one for $5000 and one for $6000. She testified the $12,900 checks, both of which had the word "gift" written in the memo section, were for tennis court time. As for the two other checks, one of which was written on the last day she saw him, February 14, 2014, Asatrian claimed she never received the proceeds of either as both bounced. She did not, however, provide proof of that at trial and neither negotiated check bore any indication of having been returned for insufficient funds. Asatrian also testified she sold her Tenafly home and used the proceeds to purchase a co-op in Fort Lee for which she does not have a mortgage.

After hearing the testimony, the Probate Part judge issued a written decision finding Asatrian entitled to the proceeds of the insurance policy less $329,238.20, which the judge found were marital assets wrongly diverted to her

A-2970-16T4

with her full knowledge and assent. Specifically, the judge found there was no question but that

> the policy was taken out voluntarily by Jeffrey in 2006 naming [Asatrian] as the beneficiary. It is clear that Stephanie thought that was unfair once she learned of this reality. It is also clear that at the time Jeffrey executed the change of beneficiary, he lacked legal capacity to make knowing decisions. The circumstances surrounding the execution of that beneficiary form clearly confirm that to be so. Stephanie arranged for the form, filled it out and provided it to a staff member of Jeffrey's for execution. That staff member was not called as a witness. However, Stephanie's own testimony confirms that she was driving him to the office and that he was not capable of exercising judgment.
>
> Her Complaint, Paragraph 28,[2] confirms that to be so and her conduct in taking him to two doctors for the purpose of evaluation confirms that she was aware he was not capable of managing his own affairs. She and Jeffrey discussed this issue only once, when she expressed an opinion to him that it was unfair and he simply stated that he would think about it. At no time, was there discussion between Stephanie and Jeffrey by which he indicated a desire to change the beneficiary.
>
> This was Stephanie's idea and was implemented by her due to her sense of unfairness as a result of the relationship. This conclusion is further confirmed by Stephanie's own action in changing the beneficiary

---

[2] In paragraph 28 of the estate's verified complaint, Stephanie alleged that "[b]y the end of March 2014, Jeffrey Appelblatt had been diagnosed with dementia and declared mentally incompetent by a licensed physician, who suggested that Plaintiff Appelblatt seek legal guardianship of her husband."

11

back to [Asatrian]. She was aware when [the Family Part judge] entered the Order that the Court was misinformed. There is simply no reason if she had confidence that Jeffrey had intended to change the beneficiaries that she would not have advised the Court of this fact and asked for an alteration in the Order. Instead, she complied.

Notwithstanding that the court found Asatrian the intended beneficiary of the policy, it did not award her the entire proceeds. Instead, the judge found it "equally clear that during the course of the marriage, Jeffrey diverted substantial marital assets without his wife's knowledge and improperly to [Asatrian]." The judge further found

> [t]his is the case anticipated in <u>Kothari v. Kothari</u>, 255 N.J. Super. 500 (App. Div. 1992) when Judge Antell wrote, at 507: "We leave for future cases the question of whether the dissipation concept also includes expenditures of marital assets, even where the parties are not considering separation, where the expenditures are made for purposes inimical to the marriage and in association with some form of matrimonial misconduct." Jeffrey's diversion of marital assets to a paramour and their child deprived his Estate of significant money. Those acts were clearly "inimical to the marriage" and constitute "matrimonial misconduct." He essentially broke the marital contract.

The judge found identifiable funds were expended by Jeffrey for the benefit of Asatrian that "clearly constituted a violation of Jeffrey's marital

obligations to his family." The court set forth its findings regarding the estate's specific claims as follows:

> • The evidence is clear that Jeffrey expended $34,738.20 in life insurance premiums for [Asatrian's] benefit.
>
> • He provided a down-payment for the Tenafly property in the amount of $52,300.00.
>
> • He provided four checks in the amount of $6,000.00, $5,000.00, $12,900.00 and $12,900.00 to [Asatrian] for a total amount of $36,800.00. She testified that all of these checked bounced; however, the Court does not find her credible. There is simply no evidence that they bounced and were clearly made payable to her. She also testified that they may have been for tennis court time. Again, this explanation lacks credibility.
>
> • From 2007 to 2009, Jeffrey paid $48,000.00 in mortgage payments and from 2010 to 2014, he paid 48 payments of $3,200.00, for a total of $153,000.00.
>
> • [Asatrian] also received gifts in the amount of $350.00 as best she can recall. The gifts are considered modest in amount and do not in themselves constitute a diversion of marital assets.
>
> • Jeffrey also provided payment for an automobile between April 2013 and February 2014; eleven payments of $400.00, in a total amount of $4,400.00.

Noting that Jeffrey and Stephanie remained together following Jeffrey's revelation of his affair with Asatrian and his devastating fatal illness, the judge

found "[t]he theory of equitable distribution is not applicable here." Concluding Jeffrey's beneficiaries had been deprived "of the entire amount" wrongly diverted, the judge ruled "it all must be returned to the Estate."

The court accordingly entered judgment in favor of "Asatrian, rightful beneficiary of a policy in the amount of $750,000" and on behalf of the estate against Asatrian in the total amount of $329,238.20, which was to be provided to the estate from the proceeds of the insurance policy. Following satisfaction of the judgment, the court ruled the FD order entered by the Family Part would be dissolved and Asatrian could receive the balance of the insurance proceeds without restriction.

Following the judge's retirement, another judge heard and denied Asatrian's motion for frivolous litigation sanctions against Jeffrey and Stephanie's children as intervenors, finding Asatrian could not show that intervenors' complaint alleging they were the rightful beneficiaries of the insurance policy "was without any reasonable basis in law or equity pursuant to N.J.S.A. 2A:15-59.1(b)."

Following the denial of her motion for sanctions, Asatrian moved to stay the judgment and to permit her to deposit the judgment amount into her attorney's trust account pending our resolution of the appeal. Stephanie filed a

cross-motion to enforce the judgment and for attorney's fees, which the court granted, ordering Asatrian to pay the judgment and the estate's fees incurred on the motion. We subsequently denied Asatrian's application for emergent relief to stay the judgment pending appeal.

Asatrian appeals, arguing the trial court erred in concluding that the estate could recoup Jeffrey's inter vivos gifts to her. Specifically, she argues Jeffrey would have no claim to recover the gifts he made to her, and as the estate succeeds only to his rights and liabilities, the estate also has no claim against her. Asatrian further argues the trial court erred as a matter of law in applying "a divorce case to account for dissipated marital assets."

Asatrian also contends the court made no findings that the moneys Jeffrey provided her were marital funds and failed to account for Jeffrey's child support obligation in the sums he provided Asatrian. Finally, she argues the court erred in denying her motion for frivolous litigation sanctions against intervenors and in awarding the estate its attorney's fees in opposing Asatrian's motion for stay and in prosecuting its own motion to compel payment of the judgment.

Stephanie and intervenors cross-appeal, arguing the trial court erred by failing to impose a constructive trust over the proceeds of the life insurance policy to prevent Asatrian's unjust enrichment. Specifically, Stephanie argues a

constructive trust is a particularly appropriate remedy when "a former paramour remains a beneficiary to a life insurance policy after the relationship has ended."

We approach this matter mindful that our review "of a trial court's fact-finding function is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). As the Supreme Court has unequivocally held, "[t]he general rule is that [factual] findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare, 154 N.J. at 411-12). The reason for the rule is clear: "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses." Pascale v. Pascale, 113 N.J. 20, 33 (1988) (quoting Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)).

Accordingly, we will not disturb the factual findings of the trial judge unless we are "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)) (internal quotation marks omitted). Because a trial court does not enjoy the advantage in discerning the law that it does in discerning the facts, a reviewing court owes no

16

special deference to the "trial court's interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We disagree with the trial court that this is the case anticipated in Kothari for the simple reason that there Judge Antell was reviewing "a finding of dissipation within the meaning of N.J.S.A. 2A:34-23.1," the equitable distribution statute. See Kothari, 255 N.J. Super. at 509. As the trial judge acknowledged, the equitable distribution statute is not applicable here because Stephanie never sued to divorce Jeffrey.

We further agree with Asatrian that Jeffrey would have no claim against her to recover the monies he gifted her, notwithstanding the monies were clearly marital funds.[3] See Jennings v. Cutler, 288 N.J. Super. 553, 562-64 (App. Div. 1996); Alburger v. Crane, 5 N.J. 573, 579-80 (1950). Accordingly, we can find no basis for the relief the trial court granted the estate, as the claim is necessarily

---

[3] No reading of the court's opinion supports Asatrian's claim that the trial court failed to make findings that the monies Jeffrey gifted her were marital assets. The judge made specific findings as to the marital assets he found Jeffrey wrongly diverted to Asatrian. The checks in the record were drawn on the checking account into which Stephanie testified Jeffrey deposited his earnings and paid the family's expenses or on the account of the limited liability company he and Stephanie owned in equal shares. As the record supports the judge's findings, we reject Asatrian's argument on this point as without merit.

derivative and Jeffrey could have no claim to recover the gifts he freely made Asatrian. We also reject the estate's argument that the Probate Part judge could have applied a constructive trust theory against Asatrian, relying on Kay v. Kay, 405 N.J. Super. 278 (App. Div. 2009), aff'd, 200 N.J. 551 (2010), a case in which equitable distribution was not applicable because the death of the defendant during the pendency of the divorce abated the action. Id. at 283.

The question presented in Kay was whether the defendant's estate could resort to a constructive trust "to prevent the unjust enrichment that would allegedly occur if plaintiff and her daughter retained marital property" the defendant alleged plaintiff had diverted into accounts in her name and her daughter's with the intent of depriving the defendant of his share. Id. at 280, 286. Relying on New Jersey's "clear and strong public policy" recognizing the rights that "arise from the marital relationship in which, presumptively, both parties contribute in varied ways to the creation, acquisition and preservation of their familial property and, thereby, secure a protectable interest to share, possess, and enjoy that property," id. at 282-83 (quoting Carr v. Carr, 120 N.J. 336, 348-49 (1990)), we held the trial court erred in dismissing the estate's claim without considering whether the equities "stemming from the facts alleged" called "for relief from the strict legal effects of defendant's death during the

18

pendency of the divorce action,"[4] id. at 281. Kay is clearly distinguishable because there, the estate was not attempting to raise a new claim, as Stephanie is here, but was instead "merely seek[ing] to continue claims raised [by the decedent in the divorce] before death," 200 N.J. at 554, a point critical to the Supreme Court in affirming our decision.[5]

Although we reverse the Probate Part's award against Asatrian, she is plainly not entitled to the proceeds of the policy based on the facts found by the judge at trial. The trial judge found that Stephanie orchestrated and directed the change of beneficiary from Asatrian to her children as Jeffrey "lacked legal capacity to make knowing decisions" when he executed the form. The judge

---

[4] The Court noted that Kay was

> not a case in which the estate sought to intervene [in the divorce] in a post-death effort to assert a new claim. Instead, it is one in which the deceased spouse himself had raised and was attempting to pursue the claim that the marital assets had been diverted to his detriment over time by his spouse for the sole benefit of that spouse and her daughter. That this matter is one in which the estate merely seeks to continue claims raised before death and that those claims are ones which, in fairness, should not be extinguished lightly or prematurely, are both considerations that are central to our agreement with the Appellate Division's conclusion.
>
> [Kay, 200 N.J. at 553-54.]

found, as Asatrian urged, that Jeffrey lacked capacity and did not intend to change the policy beneficiary from Asatrian to his children with Stephanie when he executed the form pursuant to Stephanie's direction.

It is undisputed, however, that Stephanie had a durable power of attorney from Jeffrey executed in June 2000, which expressly granted her the power "[t]o exercise all rights in life insurance policies, including, but not limited to, the right . . . to change the designated beneficiary thereof."  If Stephanie directed the change in beneficiary after Jeffrey's incapacity as the trial judge found and as is well-supported by the record, it was a right he ceded to her as his attorney-in-fact.  See Kisselbach v. Cty. of Camden, 271 N.J. Super. 558, 564-65 (App. Div. 1994).  Indeed, she used the power of attorney to execute the change of beneficiary form changing the beneficiary back to Asatrian pursuant to the Family Part's order.

Stephanie's lawful exercise of the power Jeffrey ceded her in effecting the change in the beneficiary from Asatrian to the Appelblatt children, even if against his wishes, mandates reversal of the judgment in Asatrian's favor.  That the policy was in Asatrian's name at the time of Jeffrey's death is not dispositive as the judge found Stephanie changed the beneficiary to Asatrian only in compliance with the order of the Family Part.  The insurance policy was in

20

custodia legis from the time Asatrian procured an order directing Jeffrey to "continue to maintain the life insurance policy" and not "change the primary beneficiary of the policy, reduce the face amount of the policy, or borrow against it until further Order of this Court" on June 30, 2014. See Wilzig v. Sisselman, 209 N.J. Super. 25, 31 (App. Div. 1986) (stating "[p]roperty is considered to be in custodia legis when it is 'in the custody of the law'"). That custody continued following Jeffrey's death when the Family Part ordered the proceeds deposited into FDIC insured accounts, restricted Asatrian's access to the funds and made her account quarterly to the estate as to their status.

We are mindful that this was a very difficult case, and the Probate Part judge was endeavoring to achieve a just resolution within the confines of the law as he understood it. We have no doubt the judge, who had long experience in the Family Part in addition to General Equity and Probate, was mindful of the estate's obligation to provide support for Asatrian's daughter, as Jeffrey had done and Stephanie agreed was appropriate, in entering the judgment he did. It is also not lost on us that the judge essentially equally divided the insurance proceeds remaining at the time of trial in October 2016, which had been reduced by pendente lite payments of $3600 a month in accordance with the Family Part's order in February 2015.

Nevertheless, there is no legal support for the dissipation theory the judge applied and Kay does not support imposition of a constructive trust because this is a new claim by the estate and one Jeffrey could not have successfully advanced during his life. Having said that, we express no opinion as to whether intervenors have a valid claim to the entire proceeds of the policy under the circumstances. At the time the policy became subject to the Family Part's order, Asatrian had a claim against the estate for support on behalf of the daughter she shared with Jeffrey. We have no doubt that had the Family Part judge understood the true state of affairs when he entered the order directing Jeffrey to maintain Asatrian's beneficiary designation on the policy, that is, that Jeffrey was suffering from a fatal illness and already lacked capacity to make decisions in his own behalf and that Stephanie could act in his stead pursuant to a durable power of attorney, that the judge could have ordered Stephanie to ensure that at least some of those proceeds were made available for the support of Jeffrey's daughter with Asatrian. Further, our Supreme Court has held our courts have the authority to enter "reasonable and equitable support orders" directly against a parent's estate. Kiken v. Kiken, 149 N.J. 441, 453 (1997).

In sum, because we find the judge's factual findings well supported by the record but find no legal support for the equitable remedy he chose, we reverse

the court's judgment as to the disposition of the insurance policy proceeds and remand for further proceedings not inconsistent with this opinion, including establishment of a support order for Asatrian's daughter with Jeffrey. The parties' remaining arguments as to fees and sanctions we find without sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed in part; reversed in part and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23