# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0428-20

S.A.M.,

    Plaintiff-Appellant,

v.

T.J.M.,

    Defendant-Respondent.

_____

> Argued March 15, 2021 – Decided May 17, 2021
>
> Before Judges Sabatino and DeAlmeida.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-0402-21.
>
> Dale E. Console argued the cause for appellant (Frank E. Tournour, PC, and Dale E. Console, attorneys; Frank E. Tournour, on the brief).
>
> Matthew Jordan argued the cause for respondent (Nelson, Fromer, Crocco & Jordan, attorneys; Matthew Jordan, of counsel and on the brief).

PER CURIAM

Plaintiff S.A.M.[1] appeals from the October 7, 2020 order of the Family Part denying her request for a final restraining order (FRO) pursuant to the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35. We vacate the October 7, 2020 order and remand for entry of an FRO.

## I.

S.A.M. and defendant T.J.M. have known each other for more than thirty years. They had a ten-year romantic relationship that ended in 2019, after which the two remained in close contact. At the time of the relevant events, they did not reside together. Their homes were approximately fifteen minutes apart by car.

On August 12, 2020, S.A.M. filed a complaint in the Family Part seeking an FRO against T.J.M. She alleged that on August 10, 2020, T.J.M. punched, pushed, strangled, threatened, and harassed her during an early morning encounter at his home. She also alleged that he threatened her with further physical violence in an electronic communication he sent to her approximately three hours after the violent encounter ended.

---

[1] We use initials to preserve the confidentiality of court records concerning domestic violence. R. 1:38-3(d)(9).

A-0428-20

The complaint alleges T.J.M.'s conduct constituted the predicate acts of assault, N.J.S.A. 2C:12-1, terroristic threats, N.J.S.A. 2C:12-3, criminal restraint, N.J.S.A. 2C:13-2, and harassment, N.J.S.A. 2C:33-4. See N.J.S.A. 2C:25-19(a) (identifying predicate acts of domestic violence under the Act). S.A.M. also alleged she is in fear of T.J.M. because he has a permit to possess a firearm and told her two months earlier of his intention to purchase a handgun. S.A.M. alleged T.J.M. previously threatened to shoot her and attempted to strike her, but missed and punched a hole in a wall. Based on these allegations, on August 12, 2020, the trial court entered a temporary restraining order (TRO) against T.J.M.

At a hearing at which both parties testified, the following facts were developed. On August 9, 2020, T.J.M. spent the afternoon at a barbeque at which he consumed ten beers over several hours. He returned home intoxicated with a friend. After T.J.M. consumed an additional four beers, his friend left.

Starting at approximately 9:00 p.m. and continuing for nearly five hours, S.A.M., who was at her home, and T.J.M. exchanged a series of emails containing numerous insults and hostile remarks. S.A.M.'s communications focused on her claim that she had recently found the back door to T.J.M.'s home ajar, which she viewed as evidence that he had a sexual encounter with a man.

3

She also accused T.J.M. of viewing pornographic images of young boys. T.J.M. focused his remarks on S.A.M.'s weight and appearance, as well as his suspicion that she had recently smoked cigarettes in his new car.

Despite the hostile tenor of the conversation, at approximately 2:30 a.m. on what had become October 10, 2020, S.A.M. decided to take a fifteen-minute drive from her home to T.J.M.'s house. She intended to confront him with a discarded cigarette package she had seen in the trash at his home, which she believed proved she had not smoked in his car. She also expressed an intention to photograph T.J.M. in what she assumed would be a compromising situation. She threatened to "blow your cover right now" with "[p]ictures for facebooking."

After letting herself into the home with a key T.J.M. had given her some time earlier to facilitate the delivery of an appliance, S.A.M. encountered T.J.M. For the following approximately thirty minutes, the parties had what the trial court found to be a heated interaction.

Although the parties offered conflicting accounts of what transpired, they agree that S.A.M. made a remark to T.J.M. that caused him to react violently. According to T.J.M., S.A.M. accused him of engaging in incest with his adult nephews. Initially, S.A.M. testified that T.J.M. must have misunderstood her.

4

When pressed on cross-examination, however, she admitted making that accusation.

According to S.A.M., T.J.M. responded by kicking her in the leg, screaming at her, and striking her with his fist in the shoulder two times and the stomach one time. He then pushed her across the room and pinned her to the wall, with one of his hands on her arm and the other holding her face. S.A.M. testified that T.J.M., who was calling her derogatory names, then pushed her to the other side of the room and strangled her with two hands. She felt at that moment that T.J.M. intended to kill her. After she apologized for the accusation, T.J.M. released her neck and ordered her to leave his house.

T.J.M., who conceded that he was "foggy" from alcohol consumption, admits putting his hands on S.A.M. after the accusation to push her out of the house when she refused to leave. He denied striking her and testified that he would likely remember if he had tried to strangle her. He also admitted that he pushed S.A.M. shortly after she arrived when he awoke to someone he thought was an intruder standing over his bed poking him. The court found that photographs of S.A.M. taken shortly after the incident depicted bruises and torn clothing.

A-0428-20

After S.A.M. left T.J.M.'s home, she blocked communications from him on her cellphone. Approximately three hours later, at 6:25 a.m., T.J.M., who was on his way to work, sent S.A.M. a text message on her computer stating:

> Fats just remember what you said I'm gonna put this in writing I will beat you w a baseball bat you cunt.

T.J.M.'s counsel conceded that this message constituted the predicate act of harassment, N.J.S.A. 2C:33-4. In addition, his counsel conceded that even if T.J.M.'s version of events was accepted as true, his pushing S.A.M. out of the house was unwarranted. Finally, T.J.M. admitted that on a prior unspecified date he punched a hole in his wall when he was mad at S.A.M., but denied having intended to hit her and denied having previously threatened her.

The court accepted T.J.M.'s concession that he committed the predicate act of harassment. The court also concluded that S.A.M. incurred physical injuries as the result of an assault by T.J.M. This constitutes the predicate act of assault, N.J.S.A. 2C:12-1. Although the court found each of the parties to be credible in some respects and not credible in other respects, it did not make detailed findings with respect to each of the physical assaults alleged by S.A.M. For example, the court did not make a finding with respect to whether T.J.M. had attempted to strangle S.A.M. The absence of a finding on this critical allegation hampers our analysis. See John Nardi, "Fatality by Strangulation,"

6

New Jersey Domestic Violence Fatality Near Fatality Review Board, 2018 Annual Report (Nonfatal strangulation is one of the strongest predictors for the subsequent homicide of victims of domestic violence); L. 2017, c. 240 (amending N.J.S.A. 2C:12-1(b) to upgrade a simple assault to a third-degree aggravated assault, with no presumption of non-incarceration, where a defendant inflicts a nonfatal strangulation on another during an act of domestic violence).

The court, however, found S.A.M. had not established a need for protection from future acts of domestic violence. The court explained its decision:

> I do not find that there is an immediate danger to [S.A.M.] But whether or not there is a future act of domestic violence, the [c]ourt can with some degree of certainty based on the history that is here of a [thirty]-year friendship, [and] a [ten]-year relationship that there were no prior physical acts of violence, where there was one incident where [T.J.M.] did hit his own wall it appears because she was saying some quite derogatory things. It seems as though that happened some time ago. The parties have not been in a relationship for some time and, hopefully, that key is no longer looming about where [S.A.M.] can get back into [T.J.M.]'s house.
>
> I do believe that the [Act] is put in place for circumstances that come close to this one . . . .
>
>      . . . .

7

And while they have known each other for [thirty] years, there has been no testimony that they have any children in common, that they live in the same residence, that they live in the same town, that they work in the same area, that the degree of caution that is often given in favor of a final restraining order, here, the consequences would be dire to someone who was actually in their own household . . . .

. . . .

I just believe that under this set of circumstances, that the future – that the concern for a future act of domestic violence should not and will not be there because there is no reason for you two to be in contact with one another.

. . . .

I am going to firmly believe that because there has not been a history of domestic violence with these parties, because [T.J.M.] was in his household and it appeared that he was under the influence, probably reacted in such a way that it appears that he had not been reacting in a [ten]-year period during the relationship and [thirty] years in this friendship and that he acted in such a way not only by alcohol but, also, because of the negative things that were being said both ways that this will not be a repeatable offense . . . .

The court made no findings with respect to the message T.J.M. transmitted to S.A.M. approximately three hours after the encounter threatening further violence against her. In particular, the court did not determine whether the message constituted the predicate act of terroristic threats alleged in the

8

complaint. See N.J.S.A. 2C:12-3 ("A person is guilty of a crime of the third degree if he threatens to commit any crime of violence with the purpose to terrorize another . . . ."). [2]

As a result of its findings, on October 7, 2020, the court entered an order vacating the TRO and dismissing S.A.M.'s complaint. On October 8, 2020, the court, informed that S.A.M. intended to file an appeal, stayed its October 7, 2020 order and reinstated the TRO pending appeal.

This appeal followed. S.A.M. raises the following argument for our consideration.

> THE TRIAL COURT ERRED IN DISMISSING THE DOMESTIC VIOLENCE RESTRAINING ORDER WHERE DEFENDANT INFLICTED DEMONSTRABLE PHYSICAL INJURY ON PLAINTIFF.

On October 21, 2020, we continued the trial court's stay of the October 7, 2020 order and reinstatement of the TRO until further order of this court.

## II.

"In our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of

---

[2] We note as well that the trial court did not make a determination of whether S.A.M. had established that T.J.M. committed the predicate act of criminal restraint, N.J.S.A. 2C:13-2, alleged in the complaint.

fact and legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013) (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). We should not disturb the "'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (alteration in original) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Deference is particularly appropriate when the evidence is testimonial and involves credibility issues because the judge who observes the witnesses and hears the testimony has a perspective the reviewing court does not enjoy. Pascale v. Pascale, 113 N.J. 20, 33 (1988) (citing Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)).

The entry of an FRO requires the trial court to make certain findings. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). The court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125. The court should make this determination "'in light of the previous history of violence between the parties.'" Ibid. (quoting Cesare, 154 N.J. at 402).

Next, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b)); see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011). This determination requires evaluation of:

> (1)   The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2)   The existence of immediate danger to person or property;
>
> (3)   The financial circumstances of the plaintiff and defendant;
>
> (4)   The best interest of the victim and any child;
>
> (5)   In determining custody and parenting time the protection of the victim's safety; and
>
> (6)   The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a); see also Cesare, 154 N.J. at 401.]

T.J.M. conceded the predicate act of harassment in his electronic communications to S.A.M. and admitted having committed the predicate act of assault by physically removing S.A.M. from his home. There is, therefore, no dispute that the first prong of the Silver analysis was established.

With respect to the second prong of Silver, it has long been established that when a court finds a defendant committed a predicate act involving physical violence, the issuance of an FRO is generally warranted. While "the Legislature did not intend that the commission of any [predicate] acts automatically mandates the issuance of a domestic violence order[,]" A.M.C. v. P.B., 447 N.J. Super. 402, 417 (App. Div. 2016) (quoting Silver, 387 N.J. Super. at 123), "[w]hen the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO 'is most often perfunctory and self-evident.'" Ibid. (quoting Silver, 387 N.J. Super. at 127). A court may "properly refuse to issue restraints" despite "finding that a defendant committed one of the predicate acts listed in N.J.S.A. 2C:25-19(a)" after considering whether there is "(1) a lack of evidence demonstrating a history of domestic violence or abuse; and (2) the commission of a predicate act that does not involve physical violence against the victim." Id. at 414. Even in the absence of a history of domestic violence, a single predicate act may be serious enough to justify issuance of an FRO. Cesare, 154 N.J. at 402.

Applying the two-prong standard in Silver and viewing the entire record, we conclude the judge mistakenly failed to issue an FRO. We reach this conclusion based on T.J.M.'s commission of a predicate act that involved

physical violence against S.A.M., that several hours after the violent encounter ended he threatened her with further physical violence, and the fact that, under the circumstances, the issuance of final restraints is undoubtedly in S.A.M.'s best interests.

Even in the absence of specific findings by the trial court with respect to the various acts of physical violence alleged by S.A.M., including a nonfatal strangulation, the record amply supports the trial court's acceptance of T.J.M.'s concession to having assaulted S.A.M. The court found credible S.A.M.'s allegations that she was bruised at the hands of T.J.M., a finding supported by photographs of S.A.M.'s injuries and torn clothing taking shortly after the assaults. At the very least, T.J.M. used enough force against S.A.M. to physically injure her. In addition, approximately three hours after the heated encounter ended, T.J.M. sent S.A.M. a message threatening to assault her with a baseball bat and calling her a derogatory insult. Although the trial court made no findings of fact with respect to the 6:25 a.m. message, T.J.M. does not deny sending it and his threat of future violence is facially apparent. While the trial court concluded that T.J.M.'s assault on S.A.M. must be examined in the context of a decades-long history of non-violence between the parties, T.J.M.'s intoxication, and S.A.M.'s uninvited late-night entry into the premises and

A-0428-20

highly provocative accusation, the influence of those factors is diminished where T.J.M.'s threat of future violence was issued in the aftermath of a physically violent confrontation with S.A.M. some three hours earlier.

In these circumstances, where a defendant has committed a predicate act involving physical violence followed by a clearly communicated threat of further physical violence sent after the initial encounter had ended, we cannot agree with the trial court's conclusion that S.A.M. has not established an immediate threat and need for protection from further acts of domestic violence. While the parties do not reside together and have no children in common, they live in relatively close proximity to each other, were recently in a long-term romantic relationship, and have been friends for thirty years. The electronic communications exchanged on the night in question demonstrates that the parties have friends in common and that each has an intimate knowledge of the details of the other's personal lives. The likelihood the parties will cross paths, intentionally or by chance, appears quite high. The record clearly demonstrates S.A.M.'s well-founded fear of future acts of domestic violence.

We therefore vacate the October 7, 2020 order and remand this matter for entry of an FRO against T.J.M. Given the passage of time, the trial court may consider whether any of the specific terms of the restraints need to be updated

14

or modified. The TRO shall remain in place until the FRO is issued in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0428-20