# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3774-21

G.M.T.,

    Plaintiff-Respondent,

v.

D.C.T.,

    Defendant-Appellant.

_____

Submitted November 27, 2023 – Decided January 11, 2024

Before Judges Gilson and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-2360-20.

Jacobs & Barbone, PA, attorneys for appellant (Louis Michael Barbone, on the brief).

Fuhrman & Edelman, attorneys for respondent (Ronald B. Edelman, on the brief).

PER CURIAM

Defendant D.C.T.[1] appeals from a June 30, 2022 final restraining order (FRO) entered against him by the Family Part pursuant to the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35.  We affirm.

I.

The following facts are derived from the record.  In March 2021, plaintiff G.M.T. and D.C.T. were in the process of obtaining a divorce.  They had twin children who were then eleven years old.  The couple and their children lived together.

On March 14, 2021, D.C.T. was charged with several criminal offenses based on allegations that he punched and strangled his son.  As a result of a court order prohibiting contact with his son, D.C.T. moved out of the marital residence.

After a series of incidents involving D.C.T.'s presence at the marital property without G.M.T.'s consent, G.M.T. filed a domestic violence complaint, which resulted in the issuance of a temporary restraining order (TRO).

On February 3, 2022, the parties executed a consent order in which G.M.T. agreed to dismissal of the TRO.  The consent order, which was approved by the

---

[1]  We use initials to preserve the confidentiality of court records concerning a domestic violence matter.  R. 1:38-3(d)(9).

court, provides that all communications between the parties regarding the children shall be by text message only, except in an emergency. In addition, the consent order provides that G.M.T. shall have exclusive use of the marital residence and property and that D.C.T. "shall stay away from and is prohibited from entering the marital residence or the property of the marital residence . . . without prejudice as to the issue of pick-up and drop-off if and when [D.C.T.] is granted parenting time with the minor children. This issue will be re-addressed at that time."

On May 18, 2022, D.C.T. resolved the criminal charges arising from the assault of his son by pleading guilty to a disorderly person's offense. At the time, he was ordered to have no contact with G.M.T., except as permitted by order of the Family Part.

Ten days later, on May 28, 2022, G.M.T. filed a domestic violence complaint and TRO against D.C.T. She alleged that he committed the predicate act of harassment, N.J.S.A. 2C:33-4, on May 28, 2022, by "contacting [G.M.T.] about their children" and being present at the marital property in violation of the consent order.[2]

---

[2] The complaint and TRO were subsequently amended administratively. The allegations supporting G.M.T.'s claim that D.C.T. committed harassment were not substantively changed.

A-3774-21

After hearing testimony from both parties and viewing a video recording

of their May 28, 2022 encounter at the marital property, the court found:

> On May 28th of 2022, while visiting a neighbor, [D.C.T.] saw his son playing lacrosse outside by himself on his property and he went to speak to his son. He testified that he has not seen his son in over a year and his son, upon seeing [D.C.T.], had run into the house to apparently speak to his mother.
>
> When [G.M.T.] walked outside to see what was going on, she recorded [D.C.T.] standing outside his truck with his arms resting on the door facing her and [G.M.T.] told [D.C.T.] to get out of there and [D.C.T.] said to [G.M.T.] twice . . . "What? I'm allowed to stop and say hi to my children."
>
> [A]nd then he said, "Are you telling me I can't stop and say hi to my children?"

The court continued:

> Here, the [c]ourt can conclude that while [D.C.T.'s] initial purpose in stopping may have been to say hi to his son that he has not seen in over a year, after his purpose was thwarted, [D.C.T.] chose to continue to stand outside his vehicle.

The court made findings with respect D.C.T.'s intent on May 28, 2022

after considering the 2021 acts by D.C.T. that formed the basis of G.M.T.'s first

domestic violence complaint. The court, which heard testimony about these

prior acts, found that

[w]hile this event in and of itself may not seem to amount to anything, when viewed in light of the history, which is necessary, particularly in cases that allege harassment, where in determining whether a defendant's conduct is likely to cause annoyance and/or alarm, the defendant's past conduct towards the victim and the history of the relationship must be taken into account.

. . . .

There is nothing in the [c]ourt's viewing of the video that suggests that [D.C.T.] was making any attempt to leave. He stayed outside his vehicle to make his point with [G.M.T.] that he is there for . . . her to see him and the [c]ourt can conclude it was done with the purpose to harass because [D.C.T.] knew that by [G.M.T.] seeing him on the property, in light of the history, he intended to seriously annoy, meaning to vex, to worry, to trouble, to offend.

Even his engagement with [G.M.T.] where he stated twice that he is allowed to be there to say hi to his children is said with the purpose to harass. That no matter what the documents may be out there dictating otherwise, he is still in control.

[D.C.T.] knows he is not permitted to be there and even conceded to the [c]ourt that he knew what he did was wrong and by engaging in that confrontation with [G.M.T.] it punctuates his need to be in control of her whereabouts, her movements, and her ability to keep away from him.

With respect to prior history, the court found that in 2021, after D.C.T.

left the marital residence because he had been ordered to have no contact with

5

his son, D.C.T. returned to the property several times. On one occasion, the court found, D.C.T. placed a padlock on a barn in which lawn care equipment was stored and did not give G.M.T. a key to that lock. The court found that D.C.T. intended to deprive G.M.T. of access to the equipment necessary to maintain the property.

The court also found that a short time later, despite a letter from G.M.T.'s counsel to D.C.T.'s counsel warning against any additional entry on the property, G.M.T. came upon D.C.T. in the barn after she cut the padlock to gain access to a screwdriver. That encounter was recorded by the parties. Having viewed the recordings, the court found that D.C.T.'s "tone" when

> telling [G.M.T.] that he recorded the event, falsely stating that she broke into her own shed to intimate that he may use this against her is harassing and is done to control her.
>
> It is intended to drive home to her that he is still in control of her by doing whatever he wants to do, even when he's well aware that he is not to engage in that behavior, and even when [G.M.T.'s] lawyer reminds him of that by way of a letter, he still does it.

The court also addressed a video recording of D.C.T. peering through the backdoor of the marital residence on another occasion in 2021 when G.M.T. was not home. The court rejected as "disingenuous" and "not credible" D.C.T.'s claim that he was at the door to determine if G.M.T. had changed the locks. The

6

court also found that in 2021, D.C.T. constructed a hunting stand facing the home ten feet off the marital property in an adjacent State forest. The court, noted that the stand did not face the woods, where D.C.T. might be expected to hunt, and was instead intended for him to "maintain[] control over" G.M.T. and to "check[] up on her" by viewing the marital residence and property.

Based on the totality of these events, the court concluded that G.M.T. established by a preponderance of the evidence that defendant's conduct on May 28, 2022, was intended to annoy and alarm her and constituted harassment.[3]

With respect to G.M.T.'s need for protection from immediate danger or further abuse, the court found that an FRO was warranted in light of the on-going divorce action, the need to facilitate D.C.T.'s reunification with the children, D.C.T.'s disregard of the consent order, and the children's best interests. The court found that without an FRO, G.M.T. would be in danger of a recurrence of domestic violence. The court entered an FRO on June 30, 2022.

This appeal followed. D.C.T. makes the following argument.

> THE TRIAL COURT'S FINDING THAT [D.C.T.'S] INITIAL PURPOSE WAS NOT TO HARASS, WAS THEN SUBJECTED TO THE COURT'S

_____

[3] The court made no findings with respect to G.M.T.'s allegation that D.C.T. committed harassment by contacting her about the children. That allegation appeared to be based on text messages D.C.T. sent G.M.T. about reunification therapy with the children, which are permitted by the consent order.

7

MISAPPLICATION OF THE ELEMENTS OF N.J.S.A. 2C:33-4(c) BY DIVINING [D.C.T.'S] ULTIMATE INTENT TO HARASS FROM NON-COMMUNICATIVE AND SURREPTITIOUS ENTRIES ONTO THE PROPERTY THAT WERE SIX MONTHS AND ELEVEN MONTHS STALE.

II.

"In our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013) (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). We should not disturb the "'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (alteration in original) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Deference is particularly appropriate when the evidence is testimonial and involves credibility issues because the judge who observes the witnesses and hears the testimony has a perspective the reviewing court does not enjoy. Pascale v. Pascale, 113 N.J. 20, 33 (1988) (citing Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)).

The entry of an FRO requires the trial court to make certain findings.  See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006).  The court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred."  Id. at 125.  The court should make this determination "'in light of the previous history of violence between the parties.'"  Ibid. (quoting Cesare, 154 N.J. at 402).  Next, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse."  Id. at 127 (citing N.J.S.A. 2C:25-29(b)); see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011).  This determination requires evaluation of:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interest of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and

A-3774-21

> (6)	The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a); see also Cesare, 154 N.J. at 401.]

Here, the trial court determined that D.C.T. committed harassment, one of the predicate acts set forth in the Act. N.J.S.A. 2C:25-19(a)(13). As applicable here, a person commits harassment if, "with purpose to harass another," he or she "[e]ngages in any . . . course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(c).

For a finding of harassment under N.J.S.A. 2C:33-4, the actor must have the purpose to harass. Corrente v. Corrente, 281 N.J. Super. 243, 249 (App. Div. 1995) (citing D.C. v. T.H., 269 N.J. Super. 458, 461-62 (App. Div. 1994); E.K. v. G.K., 241 N.J. Super. 567, 570 (App. Div. 1990)). Finding a party had the purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487 (citing State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)). A purpose to harass may be inferred from the evidence. Common sense and experience may also inform a

10

determination or finding of purpose. State v. Hoffman, 149 N.J. 564, 577 (1997) (citing State v. Richards, 155 N.J. Super. 106, 118 (App. Div. 1978)).

We have carefully reviewed the record and find that it contains sufficient support for the trial court's conclusion that D.C.T. committed the predicate act of harassment on May 28, 2022. D.C.T. admits that he drove onto the marital property, which he acknowledges was a violation of the consent order. D.C.T. claims that his intent in violating the order was to say hello to his son. The video recording of his encounter with G.M.T., however, depicts his defiant, and plainly incorrect, declarations that he is entitled to enter the marital property at will to visit his children. The consent order, of which D.C.T. was aware, unequivocally prohibits him from entering the marital property and states that the question of his entry on the property to pick-up or drop off his children would be addressed by the court if and when he is granted parenting time. No order granting D.C.T. parenting time with his children was entered prior to March 28, 2022. Nothing in the record supports D.C.T. purported belief that he had a right to drive his truck onto the marital property and greet his son.

The record also supports the trial court's determination that D.C.T., once confronted by G.M.T., made no movement to leave the marital property, evidencing his intent to annoy and alarm G.M.T. Although D.C.T.'s brief argues

11

that when G.M.T. "told [D.C.T.] to leave, he did," the video recording depicts the opposite. When G.M.T. directed D.C.T. to leave the property, he stood by his truck, repeatedly said he was allowed "to stop by to say hi to my children," held up his cellphone, presumably to start recording the encounter, and stated "are you telling me I can't do" before the video created by G.M.T. stopped. There is ample support for the court's conclusion that D.C.T.'s initial refusal to leave the marital property and his hostile responses to G.M.T. were intended to alarm and annoy her and constituted harassment.

We also find no error in the trial court's consideration of D.C.T.'s prior surreptitious entries onto marital property when it concluded that his purpose on May 28, 2022, was to harass G.M.T. The record contains credible evidence that D.C.T. repeatedly engaged in conduct designed to alarm and annoy G.M.T., including locking her out of a barn that contained equipment necessary to maintain the marital property, confronting G.M.T. with a baseless accusation of theft, peering into her home, and erecting a hunting stand facing G.M.T.'s home just ten feet from the property line. The record establishes a prolonged course of conduct by D.C.T. designed to demonstrate his defiant presence at the marital property in order to alarm and annoy G.M.T. The trial court properly considered the May 28, 2022 event in context with D.C.T.'s past behavior.

12

To the extent we have not specifically addressed D.C.T.'s remaining claims, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION